No. 04-644

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 245

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

JASON LUCAS GARRYMORE,

       Defendant and Appellant.

APPEAL FROM:    The District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2003-37,
Honorable John S. Henson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          William F. Hooks (argued), Attorney at Law, Helena, Montana

      For Respondent:

          Honorable Mike McGrath, Attorney General; Mark E. Mattioli (argued),
Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, County Attorney; Suzy Boylan-Moore
and Andrew Paul, Deputy County Attorneys, Missoula, Montana

                      Heard:  November 30, 2005
             Submitted: June 6, 2006
             Decided:  October 2, 2006

Filed:

_____
                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     A jury convicted Appellant Jason Lucas Garrymore of deliberate homicide on February 27, 2004. Thereafter, the Fourth Judicial District Court sentenced him to life imprisonment without the possibility of parole. Garrymore challenges the parole restriction and urges us to vacate his sentence. We affirm.

¶2     We consider the following issues on appeal:

¶3     (1) Does Garrymore's failure to object to the District Court's imposition of sentence preclude our review on appeal?

¶4     (2) Did the District Court's imposition of the parole eligibility restriction pursuant to § 46-18-202(2), MCA (2001), violate Garrymore's federal and state constitutional and statutory rights to jury trial and due process?

## BACKGROUND

¶5     After an incident on January 2, 2003, left nearly two-year-old Tylin Garrymore dead, the State charged her father, Appellant Jason Lucas Garrymore (Garrymore), with deliberate homicide in violation of § 45-5-102, MCA (2001). Garrymore pleaded not guilty to the charge on February 4, 2003, and the case proceeded to trial by jury. The jury convicted Garrymore of deliberate homicide on February 27, 2004.

¶6     After completion of a pre-sentence report, Garrymore's case proceeded to sentencing on May 6, 2004. At the hearing, both Garrymore and the State presented evidence of Garrymore's past conduct and character, and each side argued for a different sentence. The State adopted the recommendation of Mr. Sonju, the probation/parole

2

officer who had prepared the pre-sentence report. Relying on considerable evidence, Mr. Sonju concluded that Garrymore could not be rehabilitated, and recommended that Garrymore be given a life sentence without the possibility of parole. Conversely, Garrymore argued that he was never given an opportunity to properly rehabilitate, especially when his mental health issues were considered, and urged the court not to impose a parole eligibility restriction.

¶7 Notwithstanding Garrymore's arguments to the contrary, the District Court adjudged Garrymore a violent offender and sentenced him to life imprisonment without the possibility of parole. The court provided the following basis for its decision:

> Now, this defendant has three convictions for domestic abuse and unlawful restraint. He was arrested on the same type of charges in Utah and California but moved out of their jurisdiction so the charges were dismissed. In addition, he was on probation when this offense was committed.
>
> . . . .
>
> Now, throughout the trial and these proceedings, contrary to the testimony, I have not seen any remorse from this defendant. And I'm going to adopt some of Mr. Sonju's reasons as my reasons. Mr. Sonju, quite candidly, said, I have been looking for all mitigating factors in this case. What is most disturbing is that I have been unable to find any.
>
> Further, I agree with Mr. Sonju, especially after viewing the photographs, that I do not believe Tylin's death was caused by a tragic culmination of accidents.
>
> Though he may not have actively planned this death, his behavior, sadistic or otherwise, certainly caused it. He has a record of being mean and abusive to women.
>
> As a result of his delay, the child died a violent, slow, painful death. She could have been taken to the hospital and possibly saved. He talked

3

the mother out of that, and it appears that he would rather save his own neck from child abuse charges than save his two-year-old adopted daughter.

Finally, in our society, and I think we all realize it, even total strangers rush to assist a child in distress. But you, her adoptive father, chose to abuse and, from the pictures, torture this little girl and let her die.

So it's now the judgment of this Court that you be sentenced to *life imprisonment in the Montana State Prison without eligibility for parole*.

(Emphasis added.) Garrymore did not object to the sentence at the time of its pronouncement by the District Court.

¶8 Garrymore appeals, asserting that the District Court imposed the parole eligibility restriction in violation of his federal and state constitutional and statutory rights.

## STANDARD OF REVIEW

¶9 We review criminal sentences that include at least one year of actual incarceration to determine whether they are legal. *State v. Herd*, 2004 MT 85, ¶ 22, 320 Mont. 490, ¶ 22, 87 P.3d 1017, ¶ 22. "[A] sentence is not illegal when it is within the parameters provided by statute." *State v. Montoya*, 1999 MT 180, ¶ 11, 295 Mont. 288, ¶ 11, 983 P.2d 937, ¶ 11 (quoting *State v. Gunderson*, 282 Mont. 183, 187, 936 P.2d 804, 806, (1997) (overruled on other grounds)). We review questions of law *de novo*. *Wadsworth v. State*, 275 Mont. 287, 298, 911 P.2d 1165, 1171 (1996).

## DISCUSSION

*Issue 1: Does Garrymore's failure to object to the District Court's imposition of sentence preclude our review on appeal?*

¶10 Noting that "the defense did not assert a state or federal constitutional objection to the sentencing court's statutory authority to restrict parole," the State offers a brief

4

argument that the merits of Garrymore's claim should not be reviewed on appeal. The State acknowledges the exception to the contemporaneous objection rule we adopted for sentencing purposes in *State v. Lenihan*, 184 Mont. 338, 602 P.2d 997 (1979), but offers "three reasons why <u>Lenihan</u> jurisdiction should not be invoked."[1]

¶11 Initially, we observe that the State's "three reason" argument is very brief and is not supported by reference to any case from our *Lenihan* jurisprudence, but, rather, by citations, without analysis, to a state civil case and a federal case addressing the exercise of plain error review, a separate doctrine not at issue herein.[2] Therefore, a comprehensive response to the State's *Lenihan* arguments is not necessary. The *Lenihan* rule states as follows:

> It appears to be the better rule to allow an appellate court to review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing.

*Lenihan*, 184 Mont. at 343, 602 P.2d at 1000.

---

[1]The State's use of the term "*Lenihan* jurisdiction" echoes our own frequent misuse of the term. As a technical matter, a court cannot create its own jurisdiction. "Jurisdiction as applied to courts is the power or capacity *given by law* to a court to entertain, hear and determine the particular case or matter." *Peña v. State*, 2004 MT 293, ¶ 21, 323 Mont. 347, ¶ 21, 100 P.3d 154, ¶ 21. This Court's jurisdiction is granted by Article VII, Section 2, Montana Constitution. The *Lenihan* rule is a judicial creation whereby this Court accepts certain sentences for appellate review. The rule is not "jurisdictional" in the sense that the Court is with or without power to hear such claims. We recognize that terms such as "*Lenihan* jurisdiction" are commonly used to refer generally to a body of law or jurisprudence, but the better practice is to avoid such uses so that clarity of the actual meaning of "jurisdiction" can be promoted.

[2]*See State v. Brister*, 2002 MT 13, ¶ 17, 308 Mont. 154, ¶ 17, 41 P.3d 314, ¶ 17, which distinguished these two doctrines.

¶12 First, the State offers that *Lenihan* does not apply because "neither party recommended a deferred or suspended sentence in this case." Although the *Lenihan* case involved the imposition of a deferred sentence, the rule we adopted therein was not limited to probationary sentences, and we have undertaken, pursuant to *Lenihan*, appellate review of sentences which had no deferred or suspended portions. *See State v. Honey*, 2005 MT 107, ¶ 35, 327 Mont. 49, ¶ 35, 112 P.3d 983, ¶ 35, and *State v. Stone*, 2004 MT 151, ¶ 45, 321 Mont. 489, ¶ 45, 92 P.3d 1178, ¶ 45.

¶13 Secondly, noting that the parole ineligibility condition Garrymore challenges on appeal was raised during the sentencing hearing by the prosecution, the State contends that the *Lenihan* rule is inapplicable because an objection by Garrymore "would not have provoked judicial vindictiveness which *Lenihan* fears," and that Garrymore's appellate challenge is nothing more than an impermissible change of theories on appeal. Though judicial vindictiveness was a concern addressed in *Lenihan*, our holding therein was not limited to such circumstances, and we have since explained that the risk of judicial vindictiveness is only "part" of the rationale underpinning the *Lenihan* rule. *See State v. Micklon*, 2003 MT 45, ¶ 9, 314 Mont. 291, ¶ 9, 65 P.3d 559, ¶ 9. Further, the general rule governing a change of theories on appeal necessarily presupposes that a "theory" or argument was first advanced in the district court, a circumstance inherently inconsistent with *Lenihan*, which applies, in the sentencing context, when the defendant remains silent and offers no argument in the district court, and, thus, is an exception to the general rule. More importantly, however, it would ultimately undermine the efficacy of the sentencing

6

process to reject appellate review of sentences where the defendant objected in the district court and changed his theory on appeal, yet allow appellate review of sentences where no objection is made, thereby creating an institutional incentive for defendants to remain silent during sentencing.

¶14 Thirdly, the State contends that Garrymore's sentence "was not, as Garrymore now contends, unconstitutional." We presume from this statement the State means that, because of the State's confidence in the constitutionality of the sentence, Garrymore's sentence cannot be "illegal" for purposes of applying the *Lenihan* rule. However, the *Lenihan* rule allows "an appellate court to review" certain sentences, on their substantive merits, which are "alleged" to be illegal, *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000, and is not limited to those appeals in which the defendant prevails on the merits. Rather, the *Lenihan* rule is a procedural mechanism whereby appellate review of certain allegedly illegal sentences, which would be procedurally barred for lack of objection, may nonetheless be obtained. After undertaking appellate review of the sentence by way of the *Lenihan* rule, the Court then takes up the merits. *See State v. Vernes*, 2006 MT 32, ¶¶ 26-30, 331 Mont. 129, ¶¶ 26-30, 130 P.3d 169, ¶¶ 26-30.

¶15 Lastly, the State suggests that, because Garrymore's sentence is within statutory parameters, we "should refrain from invoking *Lenihan* to address a constitutional challenge to § 46-18-202(2)," citing only to *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781 (2002), which addressed plain error review, which, we again note, is a separate doctrine. The State offers no analysis from our *Lenihan* jurisprudence in support

7

of its "statutory parameters" argument or why *Lenihan* should not apply to Garrymore's particular constitutional challenge. Therefore, we decline to address the issue further.[3]

We therefore undertake appellate review of the sentencing issue raised herein.

*Issue 2: Did the District Court's imposition of the parole eligibility restriction pursuant to § 46-18-202(2), MCA (2001), violate Garrymore's federal and state constitutional and statutory rights to jury trial and due process?*

¶16 Convicted of deliberate homicide pursuant to § 45-5-102(1)(a), MCA, Garrymore received a life sentence without the possibility of parole from the District Court. On appeal, Garrymore argues that the District Court's imposition of the parole eligibility restriction was unconstitutional. Specifically, he argues that the parole eligibility restriction constitutes a sentence enhancement which was based on facts not found by a jury. Accordingly, Garrymore argues that the imposition of the parole eligibility restriction by the District Court violated his rights to trial by jury and due process guaranteed by both the Montana and United States Constitutions, as well as commensurate state statutory rights provided by § 46-1-401, MCA.

### Federal Constitutional Claim

¶17 Garrymore's federal constitutional claim is predicated on the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348

---

[3]We have decided a number of cases addressing or touching on the meaning of an "illegal" sentence for purposes of the *Lenihan* rule: *see,* for example*, State v. Nelson*, 274 Mont. 11, 906 P.2d 663 (1995); *State v. Lafley*, 1998 MT 21, 287 Mont. 276, 954 P.2d 1112; and *State v. Legg*, 2004 MT 26, 319 Mont. 362, 84 P.3d 648, but have not fully addressed the contours of the term. Further development of this issue, and reconciliation of inconsistencies in these and other cases, may be necessary. However, neither of the parties has cited to any of these cases or offered such argument, and we thus deem it inappropriate to undertake such issues until they have been properly raised and briefed.

(2000), a case which focused on the interplay between sentence enhancement statutes, a sentencing judge's discretion, and the Sixth and Fourteenth Amendments to the United States Constitution. *Apprendi* and its progeny have impacted sentencing statutes, sentencing guidelines, and criminal sentences throughout the country, and according to Garrymore, lead to the inexorable conclusion that the District Court unconstitutionally imposed the parole eligibility restriction upon him.

¶18    In *Apprendi*, a defendant pled guilty in New Jersey state court to three offenses, one of which was possession of a firearm for an unlawful purpose. *Apprendi*, 530 U.S. at 469-70, 120 S. Ct. at 2352. Classified as a second-degree offense by New Jersey law, possession of a firearm for an unlawful purpose carried a penalty range of five to ten years. After a plea hearing at which the trial judge heard sufficient evidence to establish the defendant's guilt on all three offenses, the court accepted the guilty plea.

¶19    However, the defendant in *Apprendi* did not receive a sentence between five and ten years, as authorized for second degree offenses in New Jersey. Rather, pursuant to a New Jersey hate crime enhancement statute, the trial judge found by a preponderance of the evidence that the defendant was motivated by racial bias, and as such, imposed an additional two years of incarceration. *Apprendi*, 530 U.S. at 471, 120 S. Ct. at 2352.

¶20    On appeal, the Supreme Court reversed, holding "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2363. The Court formulated the following rule:

9

Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. Applying the rule to the facts in *Apprendi*, the Court determined that New Jersey's sentencing scheme was unconstitutional, because factfinding by the sentencing judge, not the jury, under the hate crime statute had increased the maximum punishment to which the defendant was exposed. *Apprendi*, 530 U.S. at 497, 120 S. Ct. at 2366-67. Therefore, the statutory scheme constituted a "departure from the jury tradition that is an indispensable part of our criminal justice system" and violated the Sixth Amendment. *Apprendi*, 530 U.S. at 497, 120 S. Ct. at 2366.

¶21 Though *Apprendi* demonstrated the Sixth Amendment's application to the sentencing process, an issue of practical importance remained; namely, what did "statutory maximum" mean for the purposes of *Apprendi*'s requirement that "any fact that increases the penalty for a crime beyond the prescribed *statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt"? *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63. This question was critical because any judicially imposed sentence which exceeded "the prescribed statutory maximum" was violative of a defendant's rights under *Apprendi*.

¶22 Accordingly, the Supreme Court provided further clarification in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). In *Ring*, the Court considered Arizona's capital sentencing statutes,

10

which provided that a death sentence could not be imposed unless, following a sentencing hearing conducted by the trial judge, one aggravating circumstance was found by the judge. *Ring*, 536 U.S. at 597, 122 S. Ct. at 2437. In *Blakely*, the Court considered Washington's determinate sentencing scheme, which provided a mandatory sentencing range for Blakely's crime, and authorized a judge to impose a sentence above the range if he found "compelling reasons justifying an exceptional sentence." *Blakely*, 542 U.S. at 299, 124 S. Ct. at 2535. In concluding that these sentencing statutes violated the holding in *Apprendi*, the Court explained that, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537. In other words:

> [T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.

*Blakely*, 542 U.S. at 303-04, 124 S. Ct. at 2537. A subtle distinction thus emerged: the "statutory maximum" is not the maximum possible sentence authorized by statute, but, rather, the maximum sentence for which a defendant is eligible "on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537.

¶23 Garrymore compares his cause to that of the defendant in *Apprendi*. Specifically, Garrymore characterizes the parole eligibility restriction as a sentence enhancement, and asserts that the parole eligibility restriction increased his penalty beyond the statutory

11

maximum authorized by the jury verdict. Accordingly, we take up the Montana statutes at issue.

¶24    Conviction of the offense of deliberate homicide, § 45-5-102(1)(a), MCA, is punishable as follows:

> (2)  A person convicted of the offense of deliberate homicide shall be punished by death as provided in 46-18-301 through 46-18-310, unless the person is less than 18 years of age at the time of the commission of the offense, by life imprisonment, or by imprisonment in the state prison for a term of not less than 10 years or more than 100 years, except as provided in 46-18-219 and 46-18-222.

Section 45-5-102(2), MCA. Because the State did not seek the death penalty, and since neither § 46-18-219, MCA, nor § 46-18-222, MCA, is applicable to Garrymore's case, the maximum sentence which could have been imposed upon Garrymore pursuant to the language of the statute was "life imprisonment." However, Garrymore argues that the parole eligibility restriction, although plainly authorized by another statute (§ 46-18-202(2), MCA), operates to allow the imposition of a sentence which improperly exceeds the range authorized by § 45-5-102(2), MCA. He argues that the "life sentences" authorized by § 45-5-102(2), MCA, contain a presumption of parole eligibility which can be overcome only by additional factfinding pursuant to § 46-18-202(2), MCA, and that because such factfinding was not reflected by the jury's verdict, but was conducted by the sentencing judge, the parole eligibility restriction violates the Sixth Amendment.

¶25    Section 46-18-202(2), MCA, which authorizes restrictions on parole eligibility, provides as follows:

12

Whenever the sentencing judge imposes a sentence of imprisonment in a state prison for a term exceeding 1 year, the sentencing judge may also impose the restriction that the offender is ineligible for parole and participation in the supervised release program while serving that term. If the restriction is to be imposed, the sentencing judge shall state the reasons for it in writing. If the sentencing judge finds that the restriction is necessary for the protection of society, the judge shall impose the restriction as part of the sentence and the judgment must contain a statement of the reasons for the restriction.

It is clear from the language of the statute that a sentencing judge, when imposing a prison term exceeding one year, *may* also impose a parole eligibility restriction in the judge's sole discretion. This provision evidences a legislative intent to authorize, but not require, sentencing judges to restrict parole whenever they impose prison terms exceeding one year. Accordingly, it is evident that the parole eligibility restriction imposed upon Garrymore fell within the statutory range for his offense. Indeed, we held in *Cavanaugh v. Crist*, 189 Mont. 274, 278, 615 P.2d 890, 893 (1980), that "[§ 46-18-202(2), MCA] does not permit district judges to add any time beyond the statutory maximum for the underlying offense," thus establishing that the restriction falls within the statutory range of punishments for offenses exceeding one year in the state prison. However, *Cavanaugh* did not address the subtle distinction later advanced by *Ring* and *Blakely*, and discussed above: whether Garrymore was eligible to receive imposition of the parole eligibility restriction under § 46-18-202(2), MCA, based upon the facts reflected in the jury's verdict.

¶26 It is for this reason Garrymore's assertion that § 45-5-102(2), MCA, contains an implicit "presumption of parole eligibility" is critical to his argument. He seeks to

13

demonstrate that under the penalty statute, standing alone and without the operation of § 46-18-202(2), MCA, he was entitled to a parole-eligible sentence (subject to the requirements of the parole statute, § 46-23-201, MCA), which was then taken away from him by the sentencing judge. However, we reject Garrymore's argument that such a presumption exists.

¶27 We find no indicia in the sentencing statutes of a legislative intent to create a presumption in favor of parole eligibility which must be overcome in order for a sentencing judge to impose a parole restriction. The broad grant of discretionary authority—clearly indicated by the term "may also impose"—given to sentencing judges under § 46-18-202(2), MCA, to impose parole eligibility restrictions on the enormous class of sentences which exceed a one-year term of imprisonment belies such an assertion. With regard to these sentences, no limitation has been placed upon the exercise of this grant of authority by the legislature. Thus, a parole-eligible sentence was not taken away from Garrymore because he was not entitled to such a sentence to begin with. There is no implicit presumption of parole eligibility.

¶28 Of course, we acknowledge that a parole eligibility restriction must be accompanied by reasons stated in writing pursuant to § 46-18-202(2), MCA. We disagree, however, with Garrymore's contention that the implicit fact-finding embodied within § 46-18-202(2), MCA, places the restriction beyond the "statutory maximum" for the purposes of *Apprendi*. We initially note that the Supreme Court has rejected the

14

argument that "every fact with a bearing on sentencing must be found by a jury . . . ."

*Jones v. United States*, 526 U.S. 227, 248, 119 S. Ct. 1215, 1226 (1999).

¶29    As the Supreme Court noted in *Blakely* and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), though the exercise of a judge's discretion often necessitates findings of fact to support a particular sentence, a defendant does not necessarily have a right to have those facts found by a jury in all instances. *Booker*, 543 U.S. at 233, 125 S. Ct. at 750; *Blakely*, 542 U.S. at 309, 124 S. Ct. at 2540. Instead, where it is conferred by a legislature, a judge can exercise "broad discretion in imposing a sentence within a statutory range." *Booker*, 543 U.S. at 233, 125 S. Ct. at 750. Thus, while a judge may not find facts which, once found, increase the defendant's exposure to punishment, a judge may find facts to support the exercise of discretion in imposing a sentence which falls within the statutory maximum. As explained in *Blakely*:

> [T]he Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned. In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail. In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

15

*Blakely*, 542 U.S. at 308-09, 124 S. Ct. at 2540.

¶30    Applying this reasoning to Garrymore's sentence demonstrates his argument is without merit.  First, as noted above, a plain reading of the statutes evidences the legislature's intent to make life imprisonment without the possibility of parole an authorized sentence for deliberate homicide.  *See* §§ 45-5-102(2) and 46-18-202(2), MCA.  Second, although § 46-18-202(2), MCA, requires written reasons to support imposition of parole eligibility restriction, those reasons need not go beyond those facts found by the jury.  Indeed, the factfinding requirement embodied in § 46-18-202(2), MCA, simply requires a judge to support his discretion with reasons, but does not tie the parole eligibility restriction to any particular facts or findings whatsoever.  Instead, under the plain language of the statute, it is entirely possible for a judge to restrict parole based solely upon facts found by the jury.

¶31    Further, imposition of a parole restriction is not necessarily improper merely because the sentencing judge finds facts, to aid in the exercise of his discretion, not found by the jury.  Here, the sentencing judge noted Garrymore's prior convictions and his lack of remorse among the factors he considered in pronouncing sentence.  Of course, as noted above, a prior conviction is a specific exception to the *Apprendi* rule, but, critical to this discussion, lack of remorse is an example of a fact "important to the exercise" of the sentencing discretion which does not "pertain to whether the defendant has a legal right to a lesser sentence . . . ."  *Blakely*, 542 U.S. at 309, 124 S. Ct. at 2540.  In other words, finding a "lack of remorse" does not trigger the imposition of the parole restriction under

the statutes nor endue the District Court with additional statutory authority to impose the restriction. Imposition of the restriction remains within the sentencing judge's discretion and a part of indeterminate sentencing. Thus, the "lack of remorse" finding was merely one which the sentencing judge found useful in guiding the exercise of his discretion, along with others.

¶32 Under *Blakely*, this sort of indeterminate sentencing scheme—i.e., leaving parole eligibility restrictions to the discretion of sentencing judges—is constitutional. Accordingly, and because § 46-18-202(2), MCA, does not remove from the jury a determination of facts necessary to restrict parole, we conclude that the statutory maximum punishment for the crime of deliberate homicide when the death penalty is not sought, for the purposes of *Apprendi*, is life imprisonment without the possibility of parole.

¶33 Faced with an almost identical issue, the Arizona Supreme Court came to the same conclusion. In *State v. Fell*, 115 P.3d 594, ¶¶ 8-19 (Ariz. 2005), the defendant argued, based on *Apprendi*, that a statutory sentencing scheme surrounding a deliberate homicide statute created a presumptive sentence of life with the possibility of parole, in part because the statute authorizing parole restrictions called for findings of fact. *Fell*, ¶¶ 13, 18. The court, however, rejected the defendant's argument, and held that (a) there was no presumption of parole eligibility for deliberate homicide, and (b) because the legislature had not required a sentencing court to find *specific facts* before restricting parole, the factfinding requirement did not increase the statutory maximum for *Apprendi* purposes.

17

*Fell*, ¶¶ 14-18; *see also Booker*, 543 U.S. at 233, 125 S. Ct. at 750.  As the court noted, "[a] statutory requirement that a judge make findings . . . does not mean that any specific finding is necessary for imposition of the sentence."  *Fell*, ¶ 18.

¶34     Section 46-18-202(2), MCA, permits a sentencing judge to impose a parole eligibility restriction whenever the judge imposes a sentence that exceeds one year. Further, while a judge must state the reasons for the restriction if it is imposed, no particular finding of fact need be included among those reasons.  For that reason, and because we conclude that the legislature intended the statutory maximum for § 45-5-102(1)(a), MCA, to be life imprisonment without the possibility of parole, we conclude that the District Court restriction of Garrymore's parole eligibility did not violate Garrymore's federal constitutional rights.

### *State Statutory Claim*

¶35     Mirroring his federal constitutional claim above, Garrymore argues that the District Court's restriction on his parole eligibility pursuant to § 46-18-202(2), MCA, violated his statutory rights under § 46-1-401, MCA (2001), a statute enacted in response to *Apprendi*.  Again, we must disagree.

¶36     Section 46-1-401, MCA (2001), provides in pertinent part:

> (1) A court may not impose an incarceration penalty enhancement specified in Title 45, Title 46, or any other provision of law unless:
> (a)    the enhancing act, omission, or fact was charged in the information, complaint, or indictment, with a reference to the statute or statutes containing the enhancing act, omission, or fact and the penalty for the enhancing act, omission, or fact;

18

(b) if the case was tried before a jury, the jury unanimously found in a separate finding that the enhancing act, omission, or fact occurred beyond a reasonable doubt; and

. . . .

(2) The enhancement issue may be submitted to a jury on a form separate from the verdict form or may be separately stated on the verdict form. The jury must be instructed that it is to reach a verdict on the offense charged in the information, complaint, or indictment before the jury can consider whether the enhancing act, omission, or fact occurred.

(3) An enhancing act, omission, or fact is an act, omission, or fact, whether stated in the statute defining the charged offense or stated in another statute, that is not included in the statutory definition of the elements of the charged offense and that allows or requires a sentencing court to add to, as provided by statute, an incarceration period provided by statute for the charged offense or to impose the death penalty instead of a statutory incarceration period provided by statute for the charged offense.

Codifying *Apprendi*, § 46-1-401, MCA, essentially requires a jury determination of the facts necessary to impose an additional sentence pursuant to a sentence enhancement statute. Because we see no substantive distinction between the principles enunciated in *Apprendi* and its progeny and this statutory rendering thereof, our disposition of Garrymore's claim under the statute is also the same as our disposition of his federal constitutional claims.

¶37 As he did above, Garrymore argues that the application of § 46-18-202(2), MCA, "allowe[ed]" or "require[ed]" the District Court to add on to the sentence authorized by § 45-5-102(2), MCA. However, as mentioned previously, § 45-5-102(2), MCA, authorizes a district court to impose both life imprisonment and life imprisonment without the possibility of parole. Thus, § 46-18-202(2), MCA, does not, vis-à-vis an "act, omission, or fact," allow or require a sentencing court to increase punishment for a

19

charged offense. Accordingly, we conclude that the District Court's sentence did not violate § 46-1-401, MCA.

### *State Constitutional Claim*

¶38 Finally, Garrymore argues that the District Court violated his rights under Article II, Sections 24 and 26, of the Montana Constitution when it restricted his parole eligibility pursuant to § 46-18-202(2), MCA. Specifically, Garrymore argues that because the Montana Constitution is more protective of the right to jury trial than the United States Constitution, he should prevail on state constitutional grounds regardless of our disposition of his case under the federal constitution and *Apprendi*. Unfortunately, we find this argument too undeveloped to undertake a distinctive application of state constitutional principles.

¶39 Garrymore correctly notes that we have interpreted Article II, Sections 24 and 26 of the Montana Constitution as affording a greater jury trial right than does the Sixth Amendment to the United States Constitution. *See Woirhaye v. Fourth Judicial Dist. Court*, 1998 MT 320, 292 Mont. 185, 972 P.2d 800. However, Garrymore fails to offer a compelling reason why the greater jury trial right in Montana dictates a different result in his case. Accordingly, we will not further consider the argument.

¶40 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Chief Justice Karla M. Gray specially concurring.

¶41     I concur in the Court's opinion on both issues.  I write separately to caution criminal defense attorneys—public defenders, appellate public defenders and privately retained counsel—that I, at least, will expect more from them in future cases asserting *Lenihan*.

¶42     As is apparent from the Court's discussion of the State's arguments about *Lenihan*'s applicability, the application of that case is far from automatic.  Not every sentence to which no objection is made at the time of sentencing may successfully be appealed under *Lenihan*.  Thus, it is my view that the party asserting the "*Lenihan* exception" bears the burden of establishing her or his entitlement to that exception.  A mere reference and citation to *Lenihan* will not suffice in the future, at least for me.

¶43     Here, in the standard of review section of Garrymore's opening brief, counsel merely cited to *Lenihan* and its progeny for the proposition that a "criminal sentence may be reviewed on appeal if it is alleged to be illegal or in excess of statutory mandates." Counsel then stated, without analysis, that "[a] failure to raise a contemporaneous objection to an illegal sentence at the time of hearing does not result in a waiver of the defendant's objection[,]" and cited to four of our cases for that proposition.  The problem

21

with this approach is that we have other cases refusing to apply the *Lenihan* exception. It is my view that counsel must present more in the way of discussion and analysis regarding entitlement to the exception.

¶44 When appellate counsel fails to do so, the result is a discussion such as that contained in our opinion here: the burden of establishing an appellant's entitlement to the *Lenihan* exception improperly shifts. Under this shift, the State becomes responsible for establishing why *Lenihan* does not—or should not—apply in a given case. While this has been our approach in the past, it is an approach I am unwilling to continue to follow. Therefore, I encourage criminal defense counsel to clearly establish entitlement to the exception in their opening brief, or risk a determination that—because they have not done so—they have not met their burden on appeal.


/S/ KARLA M. GRAY


Justice James C. Nelson, specially concurring.

## I.     Introduction

¶45 I concur in the result of the Court's Opinion; however, I do not agree with the lack of detail in the Court's reasoning. I therefore write separately to set forth an independent analysis of the important issues raised in this appeal.

¶46 In particular, with respect to Issue 1, I agree with the Court that, notwithstanding Garrymore's failure to raise his sentencing claims in the first instance in the District Court, we nevertheless may reach the merits of those claims by way of the *Lenihan*

exception to the timely objection rule. *See State v. Lenihan*, 184 Mont. 338, 343, 602 P.2d 997, 1000 (1979). In arriving at this conclusion, I also agree with the Court's rejection of each of the State's "three reasons" why *Lenihan* should not be available to Garrymore.

¶47 I find it insufficient, however, to end the discussion there and not explain why Garrymore has, in fact, satisfied the requisites for invoking the *Lenihan* exception. Indeed, the Court's truncated analysis implies that unless the State demonstrates in a given case that the *Lenihan* exception is *not* available, the appealing defendant may, by default, invoke it. This is not the case, as explained below, though the Court's treatment of Issue 1 could lead one to believe otherwise.

¶48 Furthermore, we stated in *Lenihan* that "[i]t appears to be the better rule to allow an appellate court to review any sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. Yet, in the 27 years since adopting this exception, we have never defined "illegal or exceeds statutory mandates." Rather, we have simply allowed defendants to invoke the exception when it seemed right to do so—and vice versa. And in most of these cases, we provided little or no insight into our reasoning. The unfortunate result of our proceeding in this manner is, as the Court implies in footnote 3 of its Opinion, that our cases have not been consistent with respect to any one conceivable definition of "illegal or exceeds statutory mandates."

Because these inconsistencies will only proliferate—and at an increasingly rapid pace[1]—until we explicitly articulate the contours of the *Lenihan* exception, I do not agree with the Court's conclusion in ¶ 11 that a comprehensive response to the State's (and Garrymore's) *Lenihan* arguments is "not necessary" here.

¶49    To the contrary, it is necessary not only that we articulate the contours of *Lenihan*, but also that, for at least three reasons, the exception be crafted as narrowly as possible. First, in basic fairness to defendants, the practicing prosecution and defense bars, and the courts, our *Lenihan* rule must be clear, unambiguous, and predictable in its application. Second, as mentioned above, *Lenihan* is an exception to the timely objection rule, which is set forth in §§ 46-20-104(2) and -701(2), MCA. While this Court has the inherent power to protect the statutory and constitutional rights of criminal defendants, *see*, *e.g.*, *State v. Finley*, 276 Mont. 126, 132-38, 915 P.2d 208, 212-15 (1996), *overruled in part on other grounds*, *State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, ¶ 21, 19 P.3d 817, ¶ 21, we are not privileged to simply ignore lawful statutory mandates in order to achieve a particular result for the sake of either palatability or expediency. Third, by not articulating a clear and narrow *Lenihan* rule, we are, implicitly, maintaining an approach that relies less on careful, comprehensive, record-based legal analysis and more on ad hoc decision-making, which serves neither the litigants nor the courts, not to mention the law.

---

[1] *Lenihan* has been cited as an exception to the time objection rule in thirty cases since it was decided on November 21, 1979. All but eight of those cases have been handed down during the last seven years.

24

¶50 In assuming that we ultimately will develop a narrow and focused definition of the *Lenihan* exception on a case-by-case basis, prompted by and as a consequence of the Court's Opinion and this Special Concurrence, we are, in truth, to quote Oliver Wendell Holmes, Jr., "spend[ing] a great deal of . . . time shoveling smoke." Notably, we already have been presented with arguments to limit the exception's availability. *See*, *e.g.*, Brief of Respondent at 6-9, *State v. Ironmaker*, 2005 MT 226N, 328 Mont. 522 (Table), 120 P.3d 811 (Table) (No. 04-610) (arguing that "*Lenihan* should be limited to facially invalid sentences which the lower court has no authority to impose"); Brief of Respondent at 7-11, *State v. Johnson*, 2005 MT 48, 326 Mont. 161, 108 P.3d 485 (No. 04-002) (suggesting that a defendant may not invoke the *Lenihan* exception where his sentence is within the range authorized by statute and he is not alleging that the statute is unconstitutional). Yet, we have chosen to ignore these arguments and persist in an ad hoc approach. Moreover, experience teaches that, not surprisingly, prosecutors and criminal defense attorneys each will argue whatever version of *Lenihan* in our existing jurisprudence best serves their particular theory in the given case. Unfortunately, as explained below, our present jurisprudential cafeteria offers up a precedent for nearly every theory. Thus, there simply is not the incentive the Court presumes for the practicing bar to seek a narrow and focused *Lenihan* rule. That obligation falls solely on this Court.

¶51 Indeed, it is our obligation to articulate the *Lenihan* exception as clearly as possible, and it is our responsibility to clean up our case law and, thereby, take some of

25

the offerings off the steam table. I am convinced that the Court's unwillingness here to shoulder this obligation and to address forthrightly the complexities of the *Lenihan* exception in its present and unstructured state in our case law will simply encourage— rather than constrain—muddled, ad hoc, and unpredictable decision-making. Again, such an approach serves no one.

¶52 For these reasons, I am proceeding beyond the Court's discussion under Issue 1 by providing a comprehensive analysis of the foundation for the *Lenihan* exception, addressing the inconsistencies in our jurisprudence, and articulating a narrow and concise *Lenihan* rule—specifically, the exception may be invoked only by a defendant who alleges a colorable claim that the sentencing court lacked statutory authority to impose the challenged sentence. I then explain, based on this articulation, why Garrymore may invoke *Lenihan* in this case.

¶53 With respect to Issue 2, I agree with the Court that application of § 46-18-202(2), MCA (2001) (the parole eligibility statute) to Garrymore's sentence of life imprisonment was not unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), and did not contravene § 46-1-401, MCA (2001). And I further agree that Garrymore did not adequately develop his claim under Article II, Sections 24 and 26, of the Montana Constitution. However, these issues are indisputably complex. And while the Court's discussion under Issue 2 supplies a measure of insight into our reasoning, I believe it is necessary and appropriate to explain in further detail, for the benefit of the parties, the practicing bar, and the lower courts, the intricacies of *Apprendi*'s application

to our parole eligibility statute.  Accordingly, I am providing an independent analysis of Garrymore's Sixth Amendment and statutory claims.

**II.    Issue 1:  Does Garrymore's failure to object in the District Court to its imposition of the parole eligibility restriction preclude our considering his challenges thereto on appeal?**

### A.    Background

¶54    Garrymore did not object during the sentencing proceeding to the District Court's restricting his parole eligibility.  Nor did he raise the constitutional and statutory issues he now pursues on appeal.  He did suggest a lesser sentence of 40 years and argued against restricting his parole eligibility.  Specifically, defense counsel recommended as follows:

> I believe it's appropriate for the Court to sentence Mr. Garrymore to a term of years, a specific term of years, and I would suggest the number 40.
>
> . . . .
>
> . . . And we would urge upon you to give Mr. Garrymore the possibility of parole after whatever period of time this Court thinks is appropriate as a sentence in this case.

However, a defendant's request at the sentencing hearing for a particular sentence does not constitute an objection to the sentence actually imposed.  *State v. Nelson*, 274 Mont. 11, 18, 906 P.2d 663, 667 (1995).  Thus, we must determine, as a threshold matter, whether Garrymore's failure to object in the District Court to its imposition of the parole eligibility restriction on his life sentence precludes our considering his challenges thereto on appeal.

¶55    Generally, this Court may not consider an issue to which a timely objection was not made in the district court.  *See* §§ 46-20-104(2), -701(2), MCA; *State v. Brister*, 2002

27

MT 13, ¶ 15, 308 Mont. 154, ¶ 15, 41 P.3d 314, ¶ 15.  However, a longstanding exception

to this rule exists in the context of sentencing.  Specifically, as mentioned above, we held

in *State v. Lenihan*, 184 Mont. 338, 602 P.2d 997 (1979), that we will "review any

sentence imposed in a criminal case, if it is alleged that such sentence is illegal or

exceeds statutory mandates, even if no objection [was] made at the time of sentencing."

*Lenihan*, 184 Mont. at 343, 602 P.2d at 1000; *see also Brister*, ¶ 16.[2]  The precise

---

[2] As the Court notes in footnote 1 of its Opinion, the State refers to this exception to the timely objection rule as *Lenihan* "jurisdiction."  This is not surprising, given that we have, on occasion, used the term "jurisdiction" with respect to our application of the *Lenihan* exception.  *See*, *e.g.*, *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000 ("We, therefore, accept jurisdiction in this matter."); *State v. Honey*, 2005 MT 107, ¶ 35, 327 Mont. 49, ¶ 35, 112 P.3d 983, ¶ 35 ("[E]ven if a defendant fails to contemporaneously object at sentencing, we will accept jurisdiction of an appeal that has been timely filed which alleges that a sentence is illegal or exceeds statutory authority."); *State v. Kroll*, 2004 MT 203, ¶ 19, 322 Mont. 294, ¶ 19, 95 P.3d 717, ¶ 19 (same); *State v. Muhammad*, 2002 MT 47, ¶ 23, 309 Mont. 1, ¶ 23, 43 P.3d 318, ¶ 23 (same); *Brister*, ¶ 16 (same).

Our occasional use of this term is a misnomer.  A court does not establish its own jurisdiction.  Rather, "[j]urisdiction as applied to courts is the power or capacity *given by law* to a court to entertain, hear and determine the particular case or matter."  *State ex rel. Johnson v. District Court of Eighteenth Judicial Dist.*, 147 Mont. 263, 267, 410 P.2d 933, 935 (1966) (internal quotation marks omitted); *see also Eberhart v. United States*, ___ U.S. ___, ___, 126 S.Ct. 403, 405 (2005) (per curiam) (equating "jurisdictional" with "prescriptions delineating the *classes of cases* . . . falling within a court's adjudicatory authority" (emphasis added, internal quotation marks omitted)).  Once it is determined that a court lacks subject matter jurisdiction, the only further action the court can take is to dismiss the case.  *In re Marriage of Miller*, 259 Mont. 424, 427, 856 P.2d 1378, 1380 (1993); *see also Arbaugh v. Y & H Corp.*, ___ U.S. ___, ___, 126 S.Ct. 1235, 1244 (2006) ("[S]ubject-matter jurisdiction, because it involves the court's power to hear a case, can never be forfeited or waived." (internal quotation marks omitted)).

Thus, given "the morass into which one is led . . . by loose talk about jurisdiction," *City of Yonkers v. United States*, 320 U.S. 685, 695, 64 S.Ct. 327, 333 (1944) (Frankfurter, J., dissenting), it is important to clarify that the *Lenihan* exception is not a source of "jurisdiction" by which we consider an appellant's otherwise procedurally barred challenge to his sentence.  Rather, this Court's jurisdiction derives from Article VII, Section 2, of the Montana Constitution, which includes "general supervisory control over all other courts," and *Lenihan*, correspondingly, is a judicially-created exception to the timely objection rule.

28

question at hand, therefore, is whether Garrymore may invoke this exception in order to have his otherwise procedurally barred challenge to his sentence heard on appeal.

### B.    The State's Three *Lenihan* Arguments

¶56    The State advances "three reasons" why the *Lenihan* exception is not available to Garrymore in this case:  (1) "the *Lenihan* rationale does not apply" because "neither party recommended a deferred or suspended sentence in this case" and because "a contemporaneous *Apprendi* objection would not have provoked the judicial vindictiveness that *Lenihan* fears"; (2) "appellants are not permitted to change theories on appeal"; and (3) "the sentence Garrymore received was within statutory parameters and it was not . . . unconstitutional."  As stated earlier, I agree with the Court's rejection of each of these assertions.[3]

### i.    The State's First Argument

---

[3] The State has also suggested, in previous cases, that we "cabin" the *Lenihan* exception, Brief of Respondent at 9, *State v. Ironmaker*, 2005 MT 226N, 328 Mont. 522 (Table), 120 P.3d 811 (Table) (No. 04-610), or simply overrule it, Brief of Respondent at 8, *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559 (No. 02-415) ("Montana is hopeful that this Court will someday reject the rationale underlying *Lenihan*, at least to the extent it permits convicted persons to remain silent with respect to the conditions a sentencing court deems necessary to suspend a given sentence.").  However, the State recently retreated from this position and argued a more favorable view of *Lenihan*.  Specifically, during oral arguments in *Gratzer v. Mahoney* (No. 05-075) on November 9, 2005, in the context of discussing the remedies available to a prisoner challenging the legality of his sentence, counsel asserted that *Lenihan* is integral to the adequacy of the remedy of direct appeal:  "[B]ecause of this Court's decision in *Lenihan*, in particular, the scope of review on direct appeal is much broader than it was previously. . . . [T]hat makes the remedy very adequate and effective."  Counsel acknowledged that he has "quibbled with *Lenihan* in many briefs" and "tried to undermine *Lenihan*"; but "in preparation for this case, I have become a *Lenihan* convert, because I think it really does . . . support the adequacy and effectiveness of direct appeal."  Given this about-face, as well as our reaffirmation of *Lenihan* in *Brister*, ¶ 21, *Lenihan*'s continued vitality is not an issue, and we therefore need only address whether the exception applies on the given facts of the case.

¶57 As the Court states in ¶ 12, it is not a prerequisite to invoking *Lenihan* that the sentence at issue be one that the sentencing court deferred or suspended. The language of *Lenihan* does not carry such an implication. Rather, we stated that "[i]t appears to be the better rule to allow an appellate court to review *any* sentence imposed in a criminal case, if it is alleged that such sentence is illegal or exceeds statutory mandates, even if no objection is made at the time of sentencing." *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000 (emphasis added). Accordingly, in *State v. Honey*, 2005 MT 107, 327 Mont. 49, 112 P.3d 983, we concluded that Honey could invoke the *Lenihan* exception, notwithstanding the fact that the district court had not suspended or deferred any portion of his sentence. *See Honey*, ¶¶ 34-35. On numerous other occasions, we have queried whether, pursuant to *Lenihan*, we could review an appellant's challenge to a sentence which had been neither suspended nor deferred. *See Nelson*, 274 Mont. at 18-20, 906 P.2d at 667-68; *State v. Swoboda*, 276 Mont. 479, 482, 918 P.2d 296, 298 (1996); *State v. Lafley*, 1998 MT 21, ¶¶ 26-27, 287 Mont. 276, ¶¶ 26-27, 954 P.2d 1112, ¶¶ 26-27; *State v. McLeod*, 2002 MT 348, ¶¶ 11, 15, 313 Mont. 358, ¶¶ 11, 15, 61 P.3d 126, ¶¶ 11, 15; *State v. Legg*, 2004 MT 26, ¶¶ 22, 60, 319 Mont. 362, ¶¶ 22, 60, 84 P.3d 648, ¶¶ 22, 60. And, in *State v. Stone*, 2004 MT 151, 321 Mont. 489, 92 P.3d 1178, the State conceded, and we agreed, that the *Lenihan* exception applied to Stone, who had been given a non-deferred, non-suspended sentence. *See Stone*, ¶¶ 45, 47. Thus, *Lenihan* is not limited to deferred and suspended sentences.

¶58    Likewise, the State's analogous suggestion that *Lenihan* applies only to cases in which there was a risk of judicial vindictiveness or retaliation at the sentencing hearing must be rejected as well.  As we explained in *Lenihan*, this risk is of particular concern in the context of a deferred (and, for the same reasons, a suspended) sentence:

> As a practical matter, [appellate review of the allegedly illegal sentence] may be a defendant's only hope in cases involving deferred imposition of sentence.  If a defendant objects to one of the conditions, the sentencing judge could very well decide to forego the deferred sentence and send him to prison.  To guard against this possibility, a defendant often times must remain silent even in the face of invalid conditions.

*Lenihan*, 184 Mont. at 343, 602 P.2d at 1000.[4]

¶59    Our acknowledgement of the risk of judicial vindictiveness or retaliation, however, was not meant as a limitation on the availability of *Lenihan* to situations in which such risk was present.  To the contrary, in adopting the *Lenihan* exception, our primary reasoning was as follows:

> The sentencing authority of a court exists solely by virtue of a statutory grant of power and therefore cannot be exercised in any manner not specifically authorized[.] . . .  Where, as in this case, it is alleged that a sentencing court has exceeded its statutory authority in imposing a specific sentence, an objection below is not a prerequisite to the challenging of the sentencing order alleged to be void.

*Lenihan*, 184 Mont. at 342, 602 P.2d at 1000 (ellipsis in original, internal quotation marks omitted) (quoting *State v. Braughton*, 561 P.2d 1040, 1041 n.2 (Or.App. 1977)).

---

[4] A recent example of this risk occurred in *State v. Erickson*, 2005 MT 276, 329 Mont. 192, 124 P.3d 119.  The district court told Erickson that, but for the plea agreement, it likely would have given him the maximum sentence and that, if Erickson objected to the court's sentencing order, his case could go to trial.  *See Erickson*, ¶ 33.  Given these statements by the court, we observed that "it is understandable why Erickson did not object to his sentence for fear of receiving a harsher sentence." *Erickson*, ¶ 33.

31

¶60     Thus, our discussion of a defendant's incentive to remain silent in the face of an invalid condition placed on his deferred (or suspended) sentence was simply an *additional* rationale for our decision to allow particular sentencing challenges to be raised for the first time on appeal. Indeed, as the Court notes in ¶ 13, we have characterized the risk of judicial vindictiveness as "part"—not "all"—of the rationale behind *Lenihan*. *See State v. Micklon*, 2003 MT 45, ¶ 9, 314 Mont. 291, ¶ 9, 65 P.3d 559, ¶ 9. And we have applied *Lenihan* in at least one situation where the defendant arguably had an incentive to speak up, not remain silent. *See Stone*, ¶¶ 44-47 (the court sentenced Stone to three years more than was statutorily authorized). Thus, *Lenihan* is not limited to cases in which there was a risk of judicial vindictiveness or retaliation at the sentencing hearing.

### ii.     The State's Second Argument

¶61     With respect to the State's contention that *Lenihan* should not be available to Garrymore because "appellants are not permitted to change theories on appeal," the State is correct that, as a general rule, "[a] party may not raise new arguments or change his legal theory on appeal," *State v. Heath*, 2004 MT 58, ¶ 39, 320 Mont. 211, ¶ 39, 89 P.3d 947, ¶ 39. However, underlying the State's argument is the premise that an objection *was made* to the particular sentencing term or condition that the appellant challenges on appeal and the appellant has since changed the legal theory advanced in support of that objection. Yet, if an objection was in fact made to the particular sentencing term or condition, it would be unnecessary for the appellant to invoke *Lenihan*, as his claim

32

would be properly preserved. The only question would be whether we must nevertheless refuse to consider it because the legal theory behind the objection has changed.

¶62 We have long held that "a party complaining of error must stand or fall upon the ground relied on in the trial court." *Bower v. Tebbs*, 132 Mont. 146, 160, 314 P.2d 731, 739 (1957). The rationale underlying this rule is that it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. *See Day v. Payne*, 280 Mont. 273, 276-77, 929 P.2d 864, 866 (1996); *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17. But this is the same rationale underlying the timely objection rule, to which *Lenihan* is an exception.

¶63 Indeed, if a challenge to a sentence comes within the meaning of *Lenihan*'s "illegal or exceeds statutory mandates" concept, then it would be counterintuitive for us to refuse to consider that challenge on the ground that the appellant objected in the district court under one legal theory but now (on appeal) advances a different legal theory. Such a rule would reward appellants who made no objection whatsoever to the alleged sentencing error (and, thus, gave the sentencing court *no* opportunity to remedy the alleged error) and punish those who did object but then changed their legal theories. Moreover, as the Court aptly observes in ¶ 13, this approach ultimately would create an institutional incentive for defendants not to object during sentencing and thereby undermine the efficacy of the sentencing process. Accordingly, the State's change-of-legal-theories argument must be rejected.

### iii. The State's Third Argument

33

¶64 The State argues that "this Court should refrain from invoking *Lenihan* to address a constitutional challenge to § 46-18-202(2)" because "the sentence Garrymore received was within statutory parameters and it was not . . . unconstitutional." Garrymore responds that "the Court cannot make this . . . determination without considering the substantive merits of the issue to begin with." In other words, Garrymore contends that since this Court will not reach the merits of a sentencing claim to which a timely objection was not made in the district court unless the *Lenihan* exception applies, application of *Lenihan* cannot depend on whether the defendant ultimately will prevail on his underlying claim.

¶65 Garrymore is correct. To say that the *Lenihan* exception may be invoked only when the contested sentence is *in fact* illegal or in excess of statutory mandates puts the proverbial cart before the horse. By virtue of the timely objection rule, we will not reach the merits and make that determination without first deciding that the defendant may invoke *Lenihan*. For this reason, *Lenihan* is more properly viewed as a "gateway" through which a defendant must pass in order to have his otherwise procedurally barred sentencing claim considered on the merits. As stated above, the question here is whether Garrymore may pass through this gateway. I now turn to that question.

## C. Definition of the *Lenihan* Exception

¶66 In *Lenihan*, we stated that an appellate court may review any sentence imposed in a criminal case if (1) it is "alleged" (2) that such sentence is "illegal or exceeds statutory

mandates." *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000. Thus, a mere allegation is sufficient to pass through the *Lenihan* gateway.[5]

¶67 However, while this standard is minimal—requiring only an allegation—it is also specific. By "illegal or exceeds statutory mandates," we did not mean that the sentencing court simply imposed an objectionable sentence. Such an interpretation of the *Lenihan* exception would render the timely objection rule a practical nullity in the sentencing context. Rather, as discussed already, the basis for our adopting this exception to the timely objection rule in the sentencing context was the principle that a sentencing court's purported exercise of power not granted to it by law is subject to appellate review.[6] Specifically, we stated that

> [t]he sentencing authority of a court exists solely by virtue of a statutory
> grant of power and therefore cannot be exercised in any manner not

[5] The allegation must, of course, conform to our rules and precedents requiring proper argument and citation. *See* M. R. App. P. 23(a)(4); *In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6 ("[W]e will not consider unsupported issues or arguments. Similarly, this Court is under no obligation to locate authorities or formulate arguments for a party in support of positions taken on appeal." (citation omitted)); *State v. Holt*, 2006 MT 151, ¶ 70, 332 Mont. 426, ¶ 70, 139 P.3d 819, ¶ 70 (Nelson, J., concurring) ("Holt did not articulate a persuasive argument on appeal which would demonstrate that his sentence in this case falls within the seminal rule set forth in *Lenihan*."). Furthermore, the allegation must be filed within the time limitations for direct appeals. *See* M. R. App. P. 5(b); *State v. Muhammad*, 2002 MT 47, ¶¶ 22-23, 309 Mont. 1, ¶¶ 22-23, 43 P.3d 318, ¶¶ 22-23; *Brister*, ¶ 16.

[6] Our cases are legion and our law well-settled that a sentencing court's authority to impose a criminal sentence derives from the law; it is not inherent. Thus, a court's authority to sentence exists only to the extent authorized by sentencing statutes. *See State v. Hicks*, 2006 MT 71, ¶ 41, 331 Mont. 471, ¶ 41, 133 P.3d 206, ¶ 41 ("A district court's authority in sentencing a criminal defendant is defined and constrained by statute, and the court has no power to impose a sentence in the absence of specific statutory authority." (citing *State v. Ruiz*, 2005 MT 117, ¶ 12, 327 Mont. 109, ¶ 12, 112 P.3d 1001, ¶ 12)); *State v. Hatfield*, 256 Mont. 340, 346, 846 P.2d 1025, 1029 (1993) ("We have long held that a district court has no power to impose a sentence in the absence of specific statutory authority." (citing *State v. Stone*, 40 Mont. 88, 105 P. 89 (1909), and *State v. Openshaw*, 172 Mont. 511, 565 P.2d 319 (1977))).

35

> specifically authorized[.] . . . Where, as in this case, it is alleged that a sentencing court has exceeded its statutory authority in imposing a specific sentence, an objection below is not a prerequisite to the challenging of the sentencing order alleged to be void.

*Lenihan*, 184 Mont. at 342, 602 P.2d at 1000 (ellipsis in original, internal quotation marks omitted) (quoting *Braughton*, 561 P.2d at 1041 n.2); *see also Commonwealth v. Lane*, 345 A.2d 233, 234 n.5 (Pa.Super. 1975) ("[A] sentence that exceeds the statutory maximum is not subject to waiver."), cited in *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000; *State v. Swoboda*, 276 Mont. 479, 482, 918 P.2d 296, 298 (1996) (explaining that the sentence in *Lenihan* was illegal or in excess of statutory mandates because the district court lacked the specific statutory authority to impose the sentence); *State v. Nelson*, 274 Mont. 11, 19, 906 P.2d 663, 668 (1995) (same).

¶68   Thus, "illegal or exceeds statutory mandates" reflects a narrow concern: whether the challenged sentence was statutorily authorized. Given this precise focus, only a defendant who alleges a colorable claim that his sentence was imposed in the absence of statutory authority may pass through the *Lenihan* gateway and have his otherwise procedurally barred sentencing claim considered on the merits.

¶69   For instance, the defendant may allege that the sentencing court imposed a sentence that is outside the range provided by the relevant sentencing statute. *See*, *e.g.*, *State v. Stone*, 2004 MT 151, ¶ 44, 321 Mont. 489, ¶ 44, 92 P.3d 1178, ¶ 44 (alleging that his five-year sentence exceeds the two-year maximum sentence authorized by the applicable statute). Or, the defendant may allege that the court imposed a sentence that is not authorized by any statute. *See*, *e.g.*, *Lenihan*, 184 Mont. at 339-40, 602 P.2d at 998

(alleging that the district judge did not have statutory authority to impose a condition on his sentence requiring him to reimburse the county for his appointed counsel's attorney fees); *State v. Hatfield*, 256 Mont. 340, 345-46, 846 P.2d 1025, 1028-29 (1993) (alleging that the district court was without authority to impose a sentence of 210 days in jail, 180 of which would be served at the discretion of the supervising probation officer); *State v. Honey*, 2005 MT 107, ¶ 34, 327 Mont. 49, ¶ 34, 112 P.3d 983, ¶ 34 (alleging that the district court was without authority to impose a restitution obligation).

¶70    Our decision in *State v. Nelson*, 274 Mont. 11, 906 P.2d 663 (1995), illustrates this narrow focus on statutory authority.  In *Nelson*, the defendant argued on appeal that because he qualified as a nonviolent felony offender, Montana law required the sentencing court to consider alternatives to incarceration when sentencing him. However, he had not raised this issue in the district court; therefore, we stated, this Court would not review his sentencing challenge unless he could invoke *Lenihan*.  *See Nelson*, 274 Mont. at 17-18, 906 P.2d at 666-67.

¶71    In addressing *Lenihan*'s applicability, we first emphasized that "an appellate court may review any sentence imposed in a criminal case, if it is alleged that such sentence is *illegal or exceeds statutory mandates*, even if no objection is made at the time of sentencing."  *Nelson*, 274 Mont. at 18, 906 P.2d at 667 (citing *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000, and *Hatfield*, 256 Mont. at 346, 846 P.2d at 1029).  We then reasoned as follows:

> Sections 46-18-201(11) and 46-18-225, MCA, do not preclude a court from
> sentencing a nonviolent felony offender to prison. . . .  Although these

37

statutes require consideration of alternatives to imprisonment, such consideration would not have necessarily changed the court's final sentence for Nelson. Nelson's sentence of ten years is not in excess of the maximum *statutorily authorized* by § 45-5-202(3), MCA.

Sections 46-18-201(11) and 46-18-225, MCA, impose an affirmative duty upon the court to take certain matters into consideration in sentencing. If the court fails to abide by this requirement, the sentence is subject to challenge or objection. *That does not mean, however, that in the absence of an objection, the sentence is thereby illegal.* The District Court, after considering the criteria in § 46-18-225, MCA, and stating its reasons why alternatives to imprisonment were not selected as required by § 46-18-201(11), MCA, *could still have legally sentenced Nelson to ten years in prison.* Thus, Nelson's sentence does not come within the exception found in *Lenihan* and *Hatfield*.

*Nelson*, 274 Mont. at 19-20, 906 P.2d at 668 (emphases added).[7]

¶72 As the foregoing reasoning in *Nelson* makes clear, an allegation that the sentencing court did not impose a *particular* sentence within the range *authorized* by the applicable punishment statutes is not the kind of error for which the *Lenihan* exception may be invoked. Nelson alleged that he might have been given an alternative to imprisonment had the district court abided by its "affirmative duty"; yet, his sentence of ten years was authorized by § 45-5-202(3), MCA. Thus, his allegation, in substance, was that the court erred in its determination of which sentence *within the statutorily authorized range* was appropriate for Nelson, not that it imposed a sentence for which there was no statutory authority. For this reason, he could not invoke the *Lenihan* exception. *See also Swoboda*, 276 Mont. at 482, 918 P.2d at 298 (reaching the same

---

[7] Had Nelson properly preserved his claim by making a timely objection in the district court, we most likely would have remanded the case for resentencing. *See Nelson*, 274 Mont. at 17, 906 P.2d at 666 ("In three recent cases in which the district courts failed to consider alternatives to incarceration for nonviolent offenders, we remanded for resentencing.").

38

conclusion concerning Swoboda's allegation); *State v. Goulet*, 277 Mont. 308, 312, 921 P.2d 1245, 1247 (1996) (same).[8]

### D. Further Clarification of the *Lenihan* Exception

¶73 Our applications of the *Lenihan* exception over the past 27 years have, for the most part, conformed with the foregoing principles; however, there have been a number of cases in which we diverged from the original meaning of "illegal or exceeds statutory mandates." As discussed earlier, these inconsistencies in our jurisprudence have rendered our precedents irreconcilable with any one conceivable definition of the *Lenihan* exception. Thus, for the sake of clarity and uniformity in this and future cases, it is necessary to revisit some of our precedents and resolve the inconsistencies, which I group below into three lines of cases. As a preliminary matter, however, I pause to explain why doing so at this juncture is appropriate.

### i. The Necessity and Appropriateness of Resolving Inconsistencies in our *Lenihan* Jurisprudence at this Juncture

---

[8] Incidentally, the Indiana courts have construed their version of the *Lenihan* exception similarly. In *Kleinrichert v. State*, 297 N.E.2d 822 (Ind. 1973), cited in *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000, the Supreme Court of Indiana stated: "Normally, this Court will not consider an issue which is first raised on appeal, but a court of review cannot ignore a fundamental error which is apparent on the face of the record, such as an incorrect sentence." *Kleinrichert*, 297 N.E.2d at 826. Subsequently, the court clarified that "to be fundamental error, the error must go to the substance of the sentence itself—i.e. an illegal sentence—not the procedures upon arriving at the sentence." *Ellis v. State*, 567 N.E.2d 1142, 1145 (Ind. 1991); *see also Carman v. State*, 473 N.E.2d 618, 620 (Ind. 1985) (*Kleinrichert* "concerned [a] sentence[] which [was] imposed outside the statutory authority of the trial judge. . . . In the instant case, on the other hand, the sentence was imposed consistently with the statutory discretion vested in the trial judge. The statute providing the penalty for a class B felony permits a sentence of twenty years, the sentence imposed here.").

¶74 At present, anyone attempting to ascertain the meaning of *Lenihan*'s "illegal or exceeds statutory mandates" concept is doomed to failure due to the fact that, as just noted, we diverged in a number of cases from our original statutory authority approach and thereby created inconsistencies in our *Lenihan* jurisprudence (which are identified and analyzed in detail below). Notably, the uncertainty and confusion engendered by our seemingly arbitrary applications of *Lenihan* is evident from some of the arguments made to this Court over the years and has led to conflicting views over whether criminal defendants have been "abusing" the exception and whether it is broad or narrow.[9]

¶75 Tellingly, both arguments concerning *Lenihan*'s scope are incorrect. The assertion that we have progressively narrowed the *Lenihan* exception over the years is belied by cases such as *State v. McLeod*, 2002 MT 348, 313 Mont. 358, 61 P.3d 126, and *State v. Legg*, 2004 MT 26, 319 Mont. 362, 84 P.3d 648, which stand for the proposition that *any* alleged sentencing error may be reviewed on appeal (by way of *Lenihan*) if the error is simply framed as a "due process" violation. *See McLeod*, ¶¶ 15-16; *Legg*, ¶¶ 58, 60. Conversely, the suggestion that we have made the *Lenihan* exception broad is belied by

---

[9] *See*, *e.g.*, Brief of Respondent at 10, *State v. Kotwicki* (No. 05-178) ("Kotwicki is abusing this Court's *Lenihan* jurisdiction by changing theories on appeal to obtain review of an alleged sentencing irregularity rather than a truly unauthorized or illegal sentence. . . . *Lenihan* is not a license to sandbag . . . ."); Brief of Respondent at 6, *State v. Ironmaker*, 2005 MT 226N, 328 Mont. 522 (Table), 120 P.3d 811 (Table) (No. 04-610) ("Although this Court has repeatedly emphasized that *Lenihan* is a narrow exception, it is not treated as such by defense counsel."); Brief of Karl Eric Gratzer in Support of Petition for Writ of Habeas Corpus at 20, *Gratzer v. Mahoney* (No. 05-075) ("[T]his Court has recently shown an inclination to restrict the already narrow *Lenihan* exception." (citing *State v. McLeod*, 2002 MT 348, 313 Mont. 358, 61 P.3d 126, and *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559)); Counsel for the State, Oral Arguments, *Gratzer v. Mahoney* (No. 05-075) (November 9, 2005) ("*Lenihan* in itself is very broad. It applies to sentencing. The Court calls it 'narrow,' but I think when it says 'narrow,' it means it only applies to sentencing.").

cases such as *State v. Lafley*, 1998 MT 21, 287 Mont. 276, 954 P.2d 1112, and *Nelson*, *supra*, which stand for the proposition that any sentence falling within the parameters of a sentencing statute—irrespective of the statute's constitutionality—does not qualify under *Lenihan* for our review. *See Lafley*, ¶¶ 26-27; *Nelson*, 274 Mont. at 19-20, 906 P.2d at 668. Until we reconcile this case law, no one can reasonably predict whether the *Lenihan* exception will be available to a given defendant who failed to object to some aspect of his or her sentence in the lower court.

¶76 The Court states that "neither of the parties has cited to any of these cases or offered such argument." Thus, the Court "deem[s] it inappropriate to undertake such issues until they have been properly raised and briefed." ¶ 15 n.3. To be sure, neither the State nor Garrymore asserts in their briefs, "This Court's applications of *Lenihan* over the years have been confusing and unpredictable. Please clarify the exception! Here's how. . . ."—a request that certainly would have been warranted. However, they do, in fact, cite an array of cases from our *Lenihan* jurisprudence, including *Lenihan*; *State v. Hatfield*, 256 Mont. 340, 846 P.2d 1025 (1993); *State v. Brewer*, 1999 MT 269, 296 Mont. 453, 989 P.2d 407; *State v. Brister*, 2002 MT 13, 308 Mont. 154, 41 P.3d 314; *State v. Legg*, 2004 MT 26, 319 Mont. 362, 84 P.3d 648; *State v. Stone*, 2004 MT 151, 321 Mont. 489, 92 P.3d 1178; *State v. Eaton*, 2004 MT 283, 323 Mont. 287, 99 P.3d 661; *State v. Muhammad*, 2002 MT 47, 309 Mont. 1, 43 P.3d 318; and *State v. Honey*, 2005 MT 107, 327 Mont. 49, 112 P.3d 983. *See* Appellant's Brief at 9-10 (March 4, 2005); Brief of Respondent at 14-15 (May 20, 2005); Appellant's Reply Brief at 1-5 (June 6,

41

2005). Even a cursory review of these precedents, in the context of the *Lenihan* issue presented by Garrymore, discloses glaring inconsistencies in our applications of the exception and consequent inequitable treatment of numerous defendants.

¶77 When faced with similar situations in the past, our approach has been to clear up the inconsistencies in our jurisprudence, even if the parties did not cite the conflicting cases and offer corresponding argument. For instance, in *State v. Montoya*, 1999 MT 180, 295 Mont. 288, 983 P.2d 937, we observed as follows:

> Although not put at issue by the parties, we note at the outset that there is a rather prevalent inconsistency in this Court's case law regarding the appropriate standard of review of criminal sentences.

*Montoya*, ¶ 11. We therefore "[took] [that] opportunity to clarify the proper standard."

*Montoya*, ¶ 13. After tracing back through our case law to the source of the confusion, *see Montoya*, ¶¶ 13-14, we held that

> [t]his Court reviews a criminal sentence only for legality . . . . To the extent that *Davison*, *White*, *Gunderson*, and any other decisions from this Court suggest that we also review criminal sentences for an abuse of discretion, they are overruled.

*Montoya*, ¶ 15.[10]

---

[10] Incidentally, although we made abundantly clear in *Montoya* that "[a] question of legality . . . implies *de novo* review," *Montoya*, ¶ 12, and, in the process, overruled any prior decisions that held otherwise, we have since reinstated the standard disapproved in *Montoya*. *See State v. Leitheiser*, 2006 MT 70, ¶ 13, 331 Mont. 464, ¶ 13, 133 P.3d 185, ¶ 13 ("The standard of review of the legality of a sentence is whether the sentencing court *abused its discretion*." (emphasis added)); *State v. Setters*, 2001 MT 101, ¶ 16, 305 Mont. 253, ¶ 16, 25 P.3d 893, ¶ 16 (same). As a result, we eventually will need to overrule either *Leitheiser* and *Setters* (and their progeny) or *Montoya* (and its progeny), notwithstanding our effort seven years ago to clarify the standard once and for all.

¶78 We have taken this approach in a number of other cases. *See In re Estate of Bradshaw*, 2001 MT 92, ¶¶ 13-16, 305 Mont. 178, ¶¶ 13-16, 24 P.3d 211, ¶¶ 13-16 (identifying discrepancies in our applications of the five criteria for assessing undue influence and overruling nine cases that stood for the "erroneous" approach, although the parties had not raised and argued the "muddled" nature of our precedents); *State v. Van Kirk*, 2001 MT 184, ¶¶ 29-47, 306 Mont. 215, ¶¶ 29-47, 32 P.3d 735, ¶¶ 29-47 (resolving the "inconsistency and confusion" over the proper test to be applied in a harmless error analysis, although the parties had not identified this inconsistency and confusion and requested clarification); *Gliko v. Permann*, 2006 MT 30, ¶¶ 15-24, 331 Mont. 112, ¶¶ 15-24, 130 P.3d 155, ¶¶ 15-24 (concluding that we "must" resolve two inconsistent lines of authority pertaining to whether the existence of a special relationship giving rise to a fiduciary duty is a question of fact or a question of law, even though the parties had merely cited some of the inconsistent cases and not specifically argued the inconsistency issue); *State v. Brister*, 2002 MT 13, ¶ 21, 308 Mont. 154, ¶ 21, 41 P.3d 314, ¶ 21 (overruling three precedents—although neither of the parties had cited to any of these cases or offered such argument—to the extent they held that failure to raise a contemporaneous objection to an illegal sentence at the time of hearing results in a waiver of the defendant's objection).

¶79 Notwithstanding, the Court, it seems, given its refusal in the case at hand to confront the inconsistencies in our *Lenihan* jurisprudence, would henceforth passively permit the continuation of a dichotomy in our case law until a party cites to the cases and

specifically argues for a resolution.  (Paradoxically, as noted earlier, there is an incentive for the parties *not* to request such resolution, since the existence of conflicting parallel standards gives each side hope that we will employ the standard favorable to their position in the given case.)  I do not believe that we should adopt such a limitation on our ability to clean up our own messes.  To be sure, I do not dispute the principle that we do not address issues not presented to us or not properly briefed.  However, this principle is not absolute.[11]  When, in the course of resolving a particular case, we become aware of inconsistent case law or parallel lines of authority standing for two irreconcilable standards, we have a duty to remedy the conflict if for no other reason than to ensure that similarly situated litigants are, in the particular case and thereafter, treated equally— which is the fundamental rationale on which the constitutional guarantee of equal protection of the law is based.

---

[11] *See Arrowhead Sch. Dist. #75, Park Co. v. Klyap*, 2003 MT 294, ¶ 79, 318 Mont. 103, ¶ 79, 79 P.3d 250, ¶ 79 (Gray, C.J., concurring in part and dissenting in part) ("I fully support this Court's efforts in recent years to 'square away' inconsistent or parallel lines of authority which cause ongoing difficulties for practitioners and trial courts.  We generally, and properly, do so by analyzing why one line of authority is preferable and overruling other cases, in whole or in part, which are inconsistent therewith.  *See*, *e.g.*, *Quantum Elec., Inc. v. Schaeffer*, 2003 MT 29, 314 Mont. 193, 64 P.3d 1026; *State v. Hardaway*, 2001 MT 252, 307 Mont. 139, 36 P.3d 900; *In re Estate of Bradshaw*, 2001 MT 92, 305 Mont. 178, 24 P.3d 211; *State v. Montoya*, 1999 MT 180, 295 Mont. 288, 983 P.2d 937.  In my view, we should continue that approach in the present case."); *Leichtfuss v. Dabney*, 2005 MT 271, ¶ 37 n.8, 329 Mont. 129, ¶ 37 n.8, 122 P.3d 1220, ¶ 37 n.8 (observing that "a court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief," and that "[i]f the court were limited to the arguments and reasoning of counsel in its decisions of cases, to the exclusion of its own observations, many cases would lead us far from what we understand to be the true object of the court" (ellipsis in original, internal quotation marks omitted)).

¶80    Accordingly, while it might be ideal to wait for the perfect case—complete with model briefing and an all-inclusive list of the cases which cite *Lenihan* and its progeny—in which to address and resolve our inconsistent applications of the *Lenihan* exception, the vastly increased reliance on *Lenihan* in recent years (*see* ¶ 48 n.1, *supra*) necessitates action on our part forthwith.  And I cannot accept refraining from undertaking this issue now on the ground that the State's and Garrymore's briefing is inadequate, as such condition is largely due to the parties' misconceptions of *Lenihan* created by our own confusing applications.

¶81    In this regard, the Chief Justice's Special Concurrence criticizes Garrymore for "merely cit[ing] to *Lenihan* and its progeny" for the proposition that a criminal sentence may be reviewed on appeal if it is alleged to be illegal or in excess of statutory mandates and then "stat[ing], without analysis," that a failure to raise a contemporaneous objection to an illegal sentence at the time of sentencing does not result in a waiver of the defendant's objection.  ¶ 43.  Yet, while Garrymore's *Lenihan* discussion in his opening brief indeed leaves much to be desired (he later develops his *Lenihan* arguments in greater detail in his reply brief), the superficiality of his analysis, notably, mirrors our own in a number of cases.  For instance, the full extent of our *Lenihan* discussion in *State v. Vernes*, 2006 MT 32, 331 Mont. 129, 130 P.3d 169, is as follows:

> Vernes also appeals from the portion of her sentence imposing restitution costs.  Vernes failed to raise an objection at the time of sentencing, but this Court will consider an appeal from an alleged illegal sentence in a criminal case, even when the defendant did not raise a timely objection in the district court.  *See State v. Lenihan* (1979), 184 Mont. 338, 602 P.2d 997.

45

*Vernes*, ¶ 26.  We then proceeded to set forth the relevant standard of review and address the merits of Vernes's claim.  *See Vernes*, ¶¶ 27-30.  Similarly, in *State v. Gallagher*, 2005 MT 336, 330 Mont. 65, 125 P.3d 1141, we provided the following brief explanation for why Gallagher could invoke the exception:

> Gallagher now challenges his sentence on appeal, and, consistent with our rule in *State v. Lenihan* (1979), 184 Mont. 338, 602 P.2d 997, we will review his challenge to the illegality of the sentence, despite no objection in the trial court.  *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000; *see also State v. Brister*, 2002 MT 13, ¶ 16, 308 Mont. 154, ¶ 16, 41 P.3d 314, ¶ 16.

*Gallagher*, ¶ 30.  And in the case at hand, for that matter, the Court never explains why Garrymore's sentencing claims satisfy the requisites for invoking *Lenihan*.

¶82   Thus, while the Chief Justice's admonition that "counsel must present more in the way of discussion and analysis regarding entitlement to the exception" is well-taken, it is also precisely why we must articulate the contours of the *Lenihan* exception and resolve the inconsistencies in our case law *now*.  Otherwise, we impose on counsel the hopeless task of deciphering—in the face of our superficial and conflicting applications of *Lenihan*—why the requisites for invoking the exception were satisfied in some cases and not in others, though the facts of the cases are materially indistinguishable.

¶83   We have been presented with a variety of arguments by the State and by criminal defendants in this case as well as in previous cases.[12]   In my view, we have been

---

[12] *See*, *e.g.*, Brief of Respondent at 6-9, *State v. Ironmaker*, 2005 MT 226N, 328 Mont. 522 (Table), 120 P.3d 811 (Table) (No. 04-610) (arguing that "*Lenihan* should be limited to facially invalid sentences which the lower court has no authority to impose"); Brief of Respondent at 9-10, *State v. Kotwicki* (No. 05-178) (asserting that "[t]he purpose of the *Lenihan*

sufficiently apprised of the issue and the competing interests. Therefore, while I might otherwise agree with the Court that "it [is] inappropriate to undertake such issues until they have been properly raised and briefed," ¶ 15 n.3, I conclude that this is one of those rare instances in which we must undertake review of our case law to resolve inconsistencies therein, notwithstanding the parties' failure to brief this issue fully.

### ii. The *Lafley* Line

¶84 In the first line of cases that is inconsistent with our statutory authority approach under *Lenihan*, we determined that the appellant's allegation did not satisfy the requisites for invoking the exception when, in fact, it did. In *State v. Lafley*, 1998 MT 21, 287 Mont. 276, 954 P.2d 1112, Lafley had been convicted of felony assault and sentenced to ten years in the Montana State Prison plus two years for the use of a dangerous weapon. *Lafley*, ¶¶ 1, 17. On appeal, he claimed, inter alia, that the two-year sentence constituted double jeopardy and cruel and unusual punishment. *Lafley*, ¶ 27. Lafley had not raised this claim in the district court; thus, he could not pursue it on appeal unless he could invoke *Lenihan*.

exception is to prevent sentencing courts from vindictively punishing convicts who object to illegal sentences or conditions," and that "[h]ow the sentencing court went about imposing its fine is not an issue that *Lenihan* compels this Court to review"); Brief of Respondent at 7-11, *State v. Johnson*, 2005 MT 48, 326 Mont. 161, 108 P.3d 485 (No. 04-002) (suggesting that a defendant may not invoke the Lenihan exception where his sentence is within the range authorized by statute and he is not alleging that the statute is unconstitutional); Appellant's Reply Brief at 3-4, *State v. Kotwicki* (No. 05-178) (arguing that, in determining whether a defendant may invoke *Lenihan*, this Court need not "attempt to divine *why* no objection was raised to the illegal sentence or condition"); Brief of Appellant at 2-3, *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559 (No. 02-415) (asserting that because a sentencing court has no power to impose a sentence in the absence of specific statutory authority, such a sentence is illegal and, therefore, may be reviewed by this Court under the *Lenihan* exception).

¶85　We determined that Lafley was "*not* challenging the legality of the sentence." *Lafley*, ¶ 27 (emphasis added).  In reaching this conclusion, we first observed that "a sentence is not illegal when it is within the parameters provided by statute."  *Lafley*, ¶ 26 (internal quotation marks omitted).  We then explained that because § 46-18-221, MCA, authorizes a court to sentence a person who uses a dangerous weapon in the commission of an offense " 'to a term of imprisonment in the state prison of not less than 2 years or more than 10 years,' " *Lafley*, ¶ 27 (quoting § 46-18-221, MCA), and because Lafley was sentenced to two years imprisonment for the use of a weapon in the commission of the assault, the sentence imposed by the district court was within statutory parameters.  Thus, we held that Lafley was barred from pursuing his claim on appeal.  *Lafley*, ¶ 27.

¶86　Yet, although our statement that "a sentence is not illegal when it is within the parameters provided by statute" was correct, it was also incomplete.  It goes without saying that a legislature may not authorize a sentencing court to contravene state or federal constitutional provisions.  Thus, while "[t]he sentencing authority of a court exists solely by virtue of a statutory grant of power," *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000 (internal quotation marks omitted), the granted power may not infringe constitutional rights.  In other words, a sentencing court's authority to impose a particular sentence derives solely from *valid* sentencing statutes.[13]

---

[13] This principle is also implicated where two allegedly conflicting sentencing statutes both apply to the defendant.  *See*, *e.g.*, *State v. Osborne*, 2005 MT 264, ¶ 4, 329 Mont. 95, ¶ 4, 124 P.3d 1085, ¶ 4, in which the appellant claimed that § 61-8-731, MCA (2003) (the felony DUI sentencing statute) conflicted with § 46-18-502, MCA (2003) (the persistent felony offender sentencing statute) and that the district court's sentencing authority was constrained by the

48

¶87    Accordingly, the fact that an appellant's sentence falls within the parameters provided by the relevant statute does not make *Lenihan* unavailable to him where his allegation is that the statute itself is invalid. A sentence is no less "illegal" because it conforms to the mandates of an unconstitutional statute.[14]   Hence, because Lafley challenged the constitutionality of § 46-18-221, MCA, he was, in fact, challenging the sentencing court's statutory authority to impose the two-year sentence, as follows:   the weapon enhancement statute cannot be applied to me without violating the constitutional proscriptions against double jeopardy and cruel and unusual punishment; thus, the statute is invalid as applied to me, and the sentencing court, therefore, lacked statutory authority to impose the two-year weapon enhancement upon my conviction of felony assault.[15]

---

former. Where one of the statutes must give way to the other (an issue we did not reach in *Osborne* because Osborne's claim was procedurally barred, *see Osborne*, ¶ 20), the sentencing court's authority exists only to the extent authorized by the prevailing statute.

Similarly, under some statutory schemes a sentencing court's authority does not arise until certain prerequisites have been satisfied. *See*, *e.g.*, *State v. Pritchett*, 2000 MT 261, ¶ 7, 302 Mont. 1, ¶ 7, 11 P.3d 539, ¶ 7 ("District courts are not *authorized* to impose a sentence of restitution until all [the] . . . statutory requirements [found in §§ 46-18-241 to -249, MCA,] are satisfied." (emphasis added)). Under such schemes, therefore, any sentence imposed by the court before the prerequisites to its authority have been fulfilled will be in the absence of statutory authority. (Note that this was not the situation in *Nelson*, *supra*. Nelson's sentence of ten years was statutorily authorized by § 45-5-202(3), MCA. *Nelson*, 274 Mont. at 20, 906 P.2d at 668. Although the sentencing court had an "affirmative duty" under §§ 46-18-201(11) and -225, MCA, to take certain matters into consideration in sentencing, doing so was not a prerequisite to its authority, *Nelson*, 274 Mont. at 20, 906 P.2d at 668, which is the crucial distinction here.)

[14] We later held that "application of the weapon enhancement statute to felony convictions where the underlying offense requires proof of use of a weapon violates the double jeopardy provision of Article II, Section 25 of the Montana Constitution." *State v. Guillaume*, 1999 MT 29, ¶ 16, 293 Mont. 224, ¶ 16, 975 P.2d 312, ¶ 16.

[15] Lafley challenged the constitutionality of § 46-18-221, MCA, as applied to him (and, concomitantly, to similarly situated defendants whose underlying convictions required proof of

49

¶88 Relying on our reasoning in *Lafley*, the State argued in *State v. Brown*, 1999 MT 31, 293 Mont. 268, 975 P.2d 321, that Brown's failure to raise his double jeopardy challenge to § 46-18-221, MCA, in the district court precluded his reliance on *Lenihan* in this Court. *Brown*, ¶ 8. Brown did not dispute the State's argument and instead urged us to consider his claim under the doctrine of plain error review, which we did. *See Brown*, ¶¶ 9-14. Yet, because Brown's sentencing challenge was identical to Lafley's (that the district court was without authority to apply the weapon enhancement statute on top of Brown's conviction of felony assault, *see Brown*, ¶ 13), he met the requisites of *Lenihan*.

¶89 For these reasons, *Lafley* and *Brown* should be overruled to the extent they hold that *Lenihan* may not be invoked by an appellant who is challenging the validity of the statute under which he was sentenced. An allegation that a sentence falls within the range authorized by the sentencing statute, but that the statute is itself invalid and that the sentencing court, therefore, was without authority to impose the sentence, is sufficient to pass through the *Lenihan* gateway. (Indeed, the Court overrules *Lafley* and *Brown*—albeit implicitly—by deciding that Garrymore may invoke *Lenihan* to have his otherwise procedurally barred challenge to the constitutionality of § 46-18-202(2), MCA, considered on the merits.)

### iii. The *McLeod* and *Legg* Line

---

the use of a weapon), as opposed to attacking the statute as unconstitutional on its face. For purposes of *Lenihan*, this makes no difference. A sentence is (allegedly) illegal regardless of whether the validity of the sentencing statute is challenged on its face or as applied.

¶90 We have also reached the mirror image result of *Lafley*—in other words, we determined that the appellant's allegation satisfied the requisites for invoking *Lenihan* when, in fact, it did not. In *State v. McLeod*, 2002 MT 348, 313 Mont. 358, 61 P.3d 126, the pre-sentence investigation report ("PSI") on which the district court had relied in imposing sentence incorrectly stated that the conviction for which McLeod was being sentenced was his fifth felony, when it actually was his fourth. *McLeod*, ¶¶ 7, 9-10. Therefore, McLeod alleged on appeal "that his sentence is illegal because it was predicated on misinformation about his criminal history, thus violating his due process rights in the Fourteenth Amendment of the United States Constitution and Article II, Section 17, of the Montana Constitution." *McLeod*, ¶ 16. McLeod had not raised this issue in the district court; thus, he was procedurally barred from raising it on appeal unless he could invoke the *Lenihan* exception.[16]

¶91 We concluded that McLeod could invoke *Lenihan*, since "[he] challenges only the legal validity of the sentence." *McLeod*, ¶ 15. Yet, McLeod had been sentenced to a term of imprisonment within the range statutorily authorized by § 45-9-102, MCA, for

---

[16] Essential to the ensuing discussion of *McLeod* is the fact that the error in the PSI could have been discovered with reasonable diligence at or before the time of sentencing, *see McLeod*, ¶¶ 10, 14, 24; thus, McLeod had an opportunity to object to the misinformation concerning the number of his prior convictions. This fact distinguishes McLeod's situation from cases in which a prior conviction upon which the sentencing court relies in imposing a particular sentence is *later*—i.e., subsequent to the sentencing proceeding—determined to be invalid. *See McLeod*, ¶¶ 17-22. In such cases, the defendants "could [not] possibly have been afforded the opportunity to object to the consideration of their previous convictions at the time of sentencing because their previous convictions remained valid at the time of sentencing." *McLeod*, ¶ 21. As such, the defendants in those cases would not be precluded by their failure to make a timely objection from pursuing post-sentencing challenges to their sentences.

51

the offense of criminal possession of dangerous drugs (he was given the maximum five-year sentence, *see McLeod*, ¶ 11), and he was not challenging the legality of § 45-9-102. Therefore, his allegation, in substance, was analogous to Nelson's, *supra*: that he might have received a lesser sentence within the statutorily authorized range had the court not relied on misinformation in the PSI. As explained above, however, this is not an allegation of an "illegal" sentence for *Lenihan* purposes. Even if the court had been aware that the current conviction was McLeod's fourth (not fifth) felony, it still had authority to sentence him to five years in prison, *see McLeod*, ¶ 26; thus, McLeod's failure to object at the time of sentencing should have precluded our consideration of his due process claim.

¶92     The same is true of *State v. Legg*, 2004 MT 26, 319 Mont. 362, 84 P.3d 648. Legg was sentenced to a fifty-year term in State prison with no part of the sentence suspended. *See Legg*, ¶ 22. This was one-half the maximum allowed under law. *See Legg*, ¶ 52. On appeal, he claimed, inter alia, that his sentence was in violation of due process because the district court had "acted arbitrarily in imposing sentence because it failed to consider the mitigating factors referenced in [a psychological evaluation of Legg], or make a finding of aggravating circumstances." *Legg*, ¶ 58. Legg had not challenged his sentence on this basis in the district court; nevertheless, we concluded that we could review the claim because Legg "has challenged the legal validity of his sentence by alleging that it was issued without regard to the mitigating factors identified in [the] evaluation, thus violating his due process rights," *Legg*, ¶ 60. This reasoning contravened our holding in

52

*Nelson*. As in *McLeod*, Legg's claim was not that the court had imposed a sentence which it had no statutory authority to impose; rather, he claimed that the court had acted arbitrarily within the sentencing range authorized by the statute. As such, he should not have been permitted to invoke *Lenihan* to obtain our review of his claim.

¶93 Therefore, *McLeod* and *Legg* also should be overruled in so far as they permit a defendant to invoke the *Lenihan* exception to obtain review of a sentence which the sentencing court had authority to impose pursuant to a concededly valid sentencing statute, but which (allegedly) was the result of an error in the *process* by which the sentence was selected within the statutorily authorized range. Otherwise, the *Lenihan* exception would swallow the timely objection rule by making appellate review of any allegedly incorrect sentence possible.

### iv. The *Micklon* Line

¶94 The third line of cases that is inconsistent with our statutory authority approach under *Lenihan* began with *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559. Pursuant to a plea agreement, Micklon pleaded guilty to felony criminal possession of dangerous drugs with intent to distribute. The agreement provided that the State would dismiss the remaining counts of the information and recommend a ten-year suspended sentence and that Micklon would pay a fine and surcharge totaling $55,000; however, the agreement did not specify a payment schedule. *See Micklon*, ¶¶ 3-4. At sentencing, Micklon requested that he be allowed to pay the $55,000 in five annual installments, while the State requested that he be required to pay the entire amount within one year

from the sentencing date. The district court agreed to Micklon's request, on the condition that interest accrue on the balance of the fine at a rate of ten percent per year. *See Micklon*, ¶ 4.

¶95 On appeal, Micklon contended "that the condition of his sentence requiring that interest accrue on the unpaid balance of his fine is illegal because no statutory authority exists for such a condition." *Micklon*, ¶ 7. Micklon had not objected to this condition in the district court; however, as discussed above, his allegation that the district court was without statutory authority to impose the condition was sufficient for him to pass through the *Lenihan* gateway and have his challenge to the interest requirement considered on the merits.

¶96 Nevertheless, we held that Micklon could not pursue his claim on appeal. In reaching this conclusion, we first observed that "[p]art of the rationale" behind the *Lenihan* exception "is that, as a practical matter, 'a defendant often times must remain silent even in the face of invalid conditions' to guard against the possibility that the sentencing court may forego a more lenient sentence if the defendant objects to one of the conditions." *Micklon*, ¶ 9 (quoting *Lenihan*, 184 Mont. at 343, 602 P.2d at 1000). Micklon, however, had not remained silent during his sentencing. In response to the district court's asking him "for his thoughts about having interest accrue on the unpaid balance of his fine as an incentive to pay the fine in a shorter time period," Micklon had responded that "although it might create a greater financial burden on him, paying interest would be acceptable to him." *Micklon*, ¶ 10. Thus, we reasoned that he had

54

"affirmatively agreed to the inclusion of the interest condition in his sentence." *Micklon*, ¶ 10. We then cited the principle, long established in the non-sentencing context, that "[w]e will not put a district court in error for an action in which the appealing party acquiesced or actively participated," *Micklon*, ¶ 10 (quoting *State v. Harris*, 1999 MT 115, ¶ 32, 294 Mont. 397, ¶ 32, 983 P.2d 881, ¶ 32),[17] and we concluded that Micklon, therefore, had "waived" his right to appeal the allegedly illegal condition on his suspended sentence, *Micklon*, ¶ 11.

¶97 Yet, although we recognized that a defendant often will refrain from objecting to what he believes is an invalid sentencing term or condition for fear of judicial vindictiveness or retaliation, our holding actually undermined this rationale. As explained in *Lenihan* and *Micklon*, when a defendant believes that objecting to an aspect of his sentence may cause the sentencing judge to forego a more lenient sentence, he often times must remain silent, even in the face of a condition of questionable legality. *See Lenihan*, 184 Mont. at 343, 602 P.2d at 1000; *Micklon*, ¶ 9. Yet, doing so is not possible as a practical matter when, as in *Micklon*, the sentencing judge solicits the defendant's thoughts concerning the condition. At that point, the defendant could voice an objection to the condition, but he thereby would run the risk that the judge will impose

---

[17] The "acquiesced or actively participated" principle had been applied in a line of cases involving alleged trial and procedural errors. *See Harris*, ¶¶ 28, 32; *State v. White Clay*, 1998 MT 244, ¶¶ 22-24, 291 Mont. 147, ¶¶ 22-24, 967 P.2d 370, ¶¶ 22-24; *Matter of R.B.O.*, 277 Mont. 272, 282-83, 921 P.2d 268, 274-75 (1996); *In re Pedersen*, 261 Mont. 284, 287, 862 P.2d 411, 413 (1993); *In re Marriage of Smith*, 242 Mont. 495, 501, 791 P.2d 1373, 1377 (1990), and cases cited therein; *In re Marriage of West*, 233 Mont. 47, 51, 758 P.2d 282, 285 (1988). *Harris* itself involved four allegations of trial error; the defendant did not allege that he was serving a sentence which was beyond the court's authority to impose. *See Harris*, ¶¶ 3-6.

a harsher sentence (e.g., make Micklon pay the $55,000 amount within one year). Alternatively, he could remain silent or state that he has no thoughts and, accordingly, be deemed to have "acquiesced" in the condition. *Micklon*, ¶ 10. Lastly, he could "affirmatively agree[]" to or "actively participate[]" in the imposition of the condition, as we concluded Micklon had done. *Micklon*, ¶ 10. Irrespective of the option he chooses, however, the defendant's desire to avoid a harsher sentence still exists.

¶98 Accordingly, it does not inevitably follow from the fact that a defendant "affirmatively agreed" to or seemingly "acquiesced" in a condition on or a term of his sentence that the *Lenihan* exception is unavailable to him, our reasoning in *Micklon* notwithstanding. Given the choice to remain silent about having interest accrue on the unpaid balance of his fine, Micklon might well have done so (so as to avoid the harsher requirement of having to pay the $55,000 within one year). However, the applicability of *Lenihan* is not subject to such happenstance—namely, whether the sentencing judge happened to solicit the defendant's thoughts regarding the aspect of his sentence later challenged on appeal.

¶99 In addition, at a more fundamental level, *Micklon*'s implication that a sentence is not "illegal" for *Lenihan* purposes if the defendant seemingly "acquiesced or actively participated" in its imposition is contrary to one of the most basic tenets of our judicial system. It is axiomatic that a sentencing court's power and authority are granted by the Legislature, not the defendant. *State v. Hicks*, 2006 MT 71, ¶ 41, 331 Mont. 471, ¶ 41, 133 P.3d 206, ¶ 41 ("A district court's authority in sentencing a criminal defendant is

defined and constrained by statute, and *the court has no power to impose a sentence in the absence of specific statutory authority*." (emphasis added)); *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000 ("The sentencing authority of a court exists *solely by virtue of a statutory grant of power* and therefore cannot be exercised in any manner not specifically authorized." (emphasis added, internal quotation marks omitted)).  A court does not gain, by virtue of a defendant's acquiescence or affirmative agreement, the power or authority to take a particular action that it does not otherwise have the power or authority to take.[18] Take, for example, an appeal by a defendant who, to evade imposition of a life sentence, bargained with the sentencing court and the prosecutor to serve two years in prison and have his left arm severed (a sentence for which there is no statutory authority), but then subsequently decided that he wanted to keep his arm.  Surely his allegation that this sentence was not statutorily authorized is not nullified by the fact that he "actively participated" in its imposition.  *Cf. Comer v. Schriro*, ___ F.3d ___, ___, 2006 WL 2613669 at *9, 2006 U.S. App. LEXIS 23291 at *31 (9th Cir. 2006) (" '[T]he waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence.' " (alteration in original) (quoting *Com. v. McKenna*, 383 A.2d 174, 181 (Pa. 1978))).

---

[18] This is not to say that the requirement that interest accrue on the balance of Micklon's $55,000 fine was *in fact* illegal.  We did not reach this issue because we concluded that Micklon had waived his right to challenge the interest condition on appeal.  Rather, the point here is that an allegation that the sentencing court lacked statutory authority to impose the challenged sentence is sufficient to pass through the *Lenihan* gateway, irrespective of the defendant's supposed complicity in that sentence.

¶100 In a similar vein, it is important to recognize that the statutorily authorized punishment for a given crime represents the Legislature's judgment as to the appropriate range of penalties for that offense. An acquiescence or active participation rule would devalue this judgment and burden the community with costs that the Legislature has not deemed appropriate given the crime.[19] We should not be so quick to disregard these costs simply because the defendant and the sentencing court have. *Lenihan* certainly does not stand for such an approach.

¶101 For the foregoing reasons, the suggestion in *Micklon*, in *State v. Eaton*, 2004 MT 283, 323 Mont. 287, 99 P.3d 661, and in *State v. Erickson*, 2005 MT 276, 329 Mont. 192, 124 P.3d 119, that *Lenihan* may not be invoked—notwithstanding an allegation that the sentencing court lacked statutory authority to impose the challenged sentence—where the defendant appears to have been complicit in its imposition, *see Micklon*, ¶ 10; *Eaton*, ¶¶ 12-13; *Erickson*, ¶¶ 30, 34, is erroneous and should be overruled explicitly.

### E.      Summation and Application

¶102 To summarize, we may review any criminal sentence that was imposed, allegedly, in the absence of statutory authority, notwithstanding the defendant's failure to object at the time of sentencing. *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000 ("Where . . . it is alleged that a sentencing court has exceeded its statutory authority in imposing a specific

---

[19] Obvious costs include those associated with incarceration or monitoring by a probation officer (pursuant to a suspended or deferred sentence) in excess of the period set forth in the relevant punishment statute. *Cf. Barker v. Wingo*, 407 U.S. 514, 519-21, 92 S.Ct. 2182, 2186-87 (1972) (discussing the "societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused").

sentence, an objection below is not a prerequisite to the challenging of the sentencing order alleged to be void." (internal quotation marks omitted)). Accordingly, the *Lenihan* exception to the timely objection rule is properly invoked by a defendant who alleges a colorable claim that the sentencing court lacked statutory authority to impose the challenged sentence.

¶103 In this regard, I note that several types of colorable sentencing challenges, distilled from the discussion above, emerge from our *Lenihan* cases thus far: the measure of the sentence (duration of imprisonment, amount of fine, etc.) falls outside the range authorized by the applicable sentencing statute; a term of or a condition on the sentence was not authorized by any statute; the sentence falls within the range authorized by the applicable sentencing statute, but the sentencing statute is itself invalid, facially or as applied; and the sentencing court's authority to impose the sentence never arose because the court did not fulfill the statutory prerequisites to that authority. Such allegations reflect the principle that a sentencing court has no power to impose a criminal sentence in the absence of specific statutory authority, *Hicks*, ¶ 41; *Lenihan*, 184 Mont. at 342, 602 P.2d at 1000, and an appellant may pass through the *Lenihan* gateway and have his otherwise procedurally barred sentencing claim reviewed on appeal if he alleges, with supporting analysis, that his sentence, or a portion thereof, is invalid for any of these reasons.

¶104 By contrast, an allegation that the sentencing court failed to fulfill an "affirmative duty" or that it erroneously selected a particular term within the range authorized by a

59

concededly valid sentencing statute (*see*, *e.g.*, the discussions of *Nelson* at ¶¶ 70-72, *supra*, and *McLeod* and *Legg* at ¶¶ 90-93, *supra*) does not meet the requisites of *Lenihan*. If the sentence the defendant received is one that the sentencing court still was authorized to impose had it not erred in the manner alleged, then the sentence is not "illegal" for *Lenihan* purposes. *See Nelson*, 274 Mont. at 20, 906 P.2d at 668.[20]

¶105 Lastly, it bears repeating that nothing in *Lenihan* is meant to preclude a timely appeal by a defendant who never had the opportunity to object at the time of sentencing

---

[20] Incidentally, as the Court states in ¶ 9, we review criminal sentences that include at least one year of actual incarceration for legality. *State v. Herd*, 2004 MT 85, ¶ 22, 320 Mont. 490, ¶ 22, 87 P.3d 1017, ¶ 22; *State v. Montoya*, 1999 MT 180, ¶ 15, 295 Mont. 288, ¶ 15, 983 P.2d 937, ¶ 15. In this regard, it is important to clarify that the term "legality" has a broader meaning in the standard of review context than it does in the *Lenihan* context.

As a standard of review, our use of the term signifies that "we will not review a sentence for mere inequity or disparity." *State v. Webb*, 2005 MT 5, ¶ 8, 325 Mont. 317, ¶ 8, 106 P.3d 521, ¶ 8; *see also Montoya*, ¶ 12; *but see State v. Ruiz*, 2005 MT 117, ¶ 8, 327 Mont. 109, ¶ 8, 112 P.3d 1001, ¶ 8. Rather, when reviewing criminal sentences for "legality," we are determining (i) whether the sentencing court had statutory authority to impose the sentence at issue, *State v. Hicks*, 2006 MT 71, ¶ 41, 331 Mont. 471, ¶ 41, 133 P.3d 206, ¶ 41; *Ruiz*, ¶ 12, (ii) whether the sentence falls within the parameters set by the applicable sentencing statutes, *Montoya*, ¶ 15, or (iii) whether the court adhered to the affirmative mandates of the applicable sentencing statutes, *see*, *e.g.*, *State v. Pence*, 273 Mont. 223, 231, 902 P.2d 41, 46 (1995); *State v. Pritchett*, 2000 MT 261, ¶ 7, 302 Mont. 1, ¶ 7, 11 P.3d 539, ¶ 7; *State v. Williams*, 2003 MT 136, ¶ 8, 316 Mont. 140, ¶ 8, 69 P.3d 222, ¶ 8; *State v. Shults*, 2006 MT 100, ¶ 34, 332 Mont. 130, ¶ 34, 136 P.3d 507, ¶ 34. We have also stated this "legality" review in a general sense in terms of correctness. *See State v. Megard*, 2006 MT 84, ¶ 16, 332 Mont. 27, ¶ 16, 134 P.3d 90, ¶ 16 ("This Court reviews a district court's imposition of sentence for legality only. The question is one of law and the determination is whether the district court interpreted the law correctly." (citation omitted)); *State v. Sprinkle*, 2000 MT 188, ¶ 6, 300 Mont. 405, ¶ 6, 4 P.3d 1204, ¶ 6 ("Sentencing is based on statutory law. We review the district court's application of the sentencing statutes to determine whether the district court was correct." (citation omitted)).

*Lenihan*, by contrast, is not concerned with whether the challenged sentence is "correct." Indeed, under such an approach, as noted earlier, the *Lenihan* exception would swallow the timely objection rule. Rather, legality in the *Lenihan* context involves a narrower question: whether the sentence at issue was *authorized* by a valid sentencing statute. As such, "legality" for *Lenihan* purposes is narrower than our "legality" standard of review of criminal sentences.

in the first place.  *See* ¶ 90 n.16, *supra*; *McLeod*, ¶¶ 17-22; *State v. Lane*, 1998 MT 76,

¶¶ 31-33, 288 Mont. 286, ¶¶ 31-33, 957 P.2d 9, ¶¶ 31-33; § 46-20-701(2), MCA.

¶106   Applying these principles to the case at hand, Garrymore may pass through the

*Lenihan* gateway and have his otherwise procedurally barred challenges to his sentence

reviewed on appeal.  Relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348

(2000), and its progeny, as well as Article II, Sections 24 and 26, of the Montana

Constitution and § 46-1-401, MCA (2001), he claims that the District Court "exceeded its

authority when it imposed the parole eligibility restriction, and thus imposed an illegal

and unconstitutional sentence."  He further explains that

> [t]he district court imposed a sentence enhancement after making additional findings of fact on contested matters.  Jason Garrymore had both a constitutional and a statutory right not to have the enhancement imposed unless it was charged in the Information, and proved to a jury by proof beyond a reasonable doubt.  The imposition of the parole restriction in this case constitutes an illegal sentence.

Thus, while Garrymore acknowledges that he was sentenced within the ranges authorized

by § 45-5-102(2), MCA (authorizing a sentence of life imprisonment) and § 46-18-

202(2), MCA (authorizing a sentencing court to restrict an offender's parole eligibility),

he claims that this latter statute is invalid because it authorized the District Court—in

contravention of the Sixth Amendment, Article II, Sections 24 and 26, and § 46-1-401,

MCA—to restrict his eligibility for parole on the basis of facts not found by a jury

beyond a reasonable doubt.  In other words, he alleges that the District Court lacked

authority to impose this portion of his sentence because § 46-18-202(2) was, as applied to

him, an unconstitutional grant of power by the Legislature and, alternatively, because a

sentencing court's application of § 46-18-202(2) is constrained by § 46-1-401. Such

allegations constitute colorable claims that satisfy the requisites for invoking the *Lenihan*

exception. We therefore may reach the merits of these claims, notwithstanding

Garrymore's failure to raise them in the first instance in the District Court.

**III. Issue 2: Did imposition of the parole eligibility restriction, because it was based on facts not found by a jury beyond a reasonable doubt, violate Garrymore's federal and state constitutional and statutory rights to jury trial and due process?**

¶107 Garrymore was convicted of violating § 45-5-102(1)(a), MCA (2001).[21] This

offense is punishable as follows:

> A person convicted of the offense of deliberate homicide shall be punished by death as provided in 46-18-301 through 46-18-310, unless the person is less than 18 years of age at the time of the commission of the offense, by life imprisonment, or by imprisonment in the state prison for a term of not less than 10 years or more than 100 years, except as provided in 46-18-219 and 46-18-222.

Section 45-5-102(2), MCA.

¶108 The State did not seek the death penalty in this case, and the exceptions listed in

§§ 46-18-219 and -222 are not at issue here. Thus, Garrymore's claims, in more specific

terms, are as follows: that the maximum sentence authorized for the offense of which he

was convicted is "life imprisonment" or "imprisonment in the state prison for a term of

not . . . more than 100 years"; that both of these maximums contemplate the possibility of

parole (which, as applied to Garrymore's sentence, requires that he serve at least 30

---

[21] Unless specified otherwise, further statutory references are to the 2001 Montana Code Annotated, which was in effect at the time Garrymore committed this crime (on or about January 3, 2003). *See State v. Brister*, 2002 MT 13, ¶ 26, 308 Mont. 154, ¶ 26, 41 P.3d 314, ¶ 26 ("[T]he law in effect at the time of the commission of the crime controls as to the possible sentence.").

years, *see* § 46-23-201(3), MCA); that § 46-18-202(2) violates federal and state constitutional provisions to the extent it authorizes a sentencing judge to "impose the restriction that the offender is ineligible for parole" on the basis of facts not found by a jury beyond a reasonable doubt; that a sentencing judge is prohibited also by statute from restricting a prisoner's parole eligibility on the basis of facts not found by a jury beyond a reasonable doubt; and that the District Court, therefore, lacked authority to add the parole eligibility restriction to Garrymore's life sentence. As noted above, these claims are based on the Sixth and Fourteenth Amendments, as interpreted in *Apprendi*; Article II, Sections 24 and 26, of the Montana Constitution; and § 46-1-401. I begin with a discussion of Garrymore's federal claim under *Apprendi*.

### A.    Federal Constitutional Claim

¶109   At issue in this case are two longstanding principles of criminal procedure: first, that upon a defendant's conviction for a charged offense, "the court must pronounce that judgment, which the law hath annexed to the crime," *Apprendi*, 530 U.S. at 478-79, 120 S.Ct. at 2356 (emphasis and internal quotation marks omitted) (quoting 4 W. Blackstone, Commentaries on the Laws of England 369-70 (1769)); and second, that "the prosecution must convince the trier of all the essential elements of guilt" "beyond a reasonable doubt," *Apprendi*, 530 U.S. at 478, 120 S.Ct. at 2356 (internal quotation marks omitted) (quoting *In re Winship*, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071 (1970), in turn quoting C. McCormick, Evidence § 321, at 681-82 (1954)).

¶110    The Framers enshrined these fundamental guarantees in the Sixth Amendment, which ensures an accused the right to "trial, by an impartial jury," and in the Fourteenth Amendment, which proscribes any deprivation of liberty without "due process of law." *See Apprendi*, 530 U.S. at 476-77, 120 S.Ct. at 2355.    The Supreme Court has characterized the right of jury trial as "no mere procedural formality, but a fundamental reservation of power in our constitutional structure.  Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."  *Blakely v. Washington*, 542 U.S. 296, 305-06, 124 S.Ct. 2531, 2538-39 (2004).

¶111    As explained above, Garrymore alleges that the parole eligibility restriction on his sentence was imposed in violation of these constitutional protections.  The starting point for analyzing this claim is the Supreme Court's decision in *Apprendi*, in which the Court addressed whether a factual determination authorizing an increase in the maximum possible prison sentence for an offense must be made by a jury on the basis of proof beyond a reasonable doubt.  *See Apprendi*, 530 U.S. at 469, 120 S.Ct. at 2351.

¶112    Apprendi was charged in a 23-count indictment with a number of shootings, as well as the unlawful possession of various weapons.  *Apprendi*, 530 U.S. at 469, 120 S.Ct. at 2352.  Pursuant to a plea agreement, he pleaded guilty in New Jersey state court to three of the charged offenses, one of which was second-degree possession of a firearm for an unlawful purpose (Count 18).  *Apprendi*, 530 U.S. at 469-70, 120 S.Ct. at 2352.  Under New Jersey law, this offense carried a penalty range of 5 to 10 years; however, as

part of the plea agreement, the State reserved the right to request the imposition of an enhanced sentence on the ground that Count 18 was committed with a biased purpose, and Apprendi, correspondingly, reserved the right to challenge the hate crime sentence enhancement as unconstitutional. *Apprendi*, 530 U.S. at 470, 120 S.Ct. at 2352.

¶113 At the plea hearing, the trial judge heard sufficient evidence to establish Apprendi's guilt on all three counts. Thereafter, the prosecutor filed a motion for an extended term under the hate crime statute. *Apprendi*, 530 U.S. at 470, 120 S.Ct. at 2352. At the evidentiary hearing on Apprendi's "purpose" for the shooting on which Count 18 was based, Apprendi adduced evidence that he was not in any way biased against African-Americans. Nevertheless, the judge found, by a preponderance of the evidence, that Apprendi's actions were taken " 'with a purpose to intimidate' " and that the crime " 'was motivated by racial bias.' " *Apprendi*, 530 U.S. at 470-71, 120 S.Ct. at 2352. This finding had the effect of doubling the range of punishment for Count 18 to between 10 and 20 years. *Apprendi*, 530 U.S. at 468-69, 120 S.Ct. at 2351. The judge then sentenced him to a 12-year term of imprisonment, which was 2 years greater than the maximum punishment authorized by the facts to which he had admitted guilt. *Apprendi*, 530 U.S. at 469, 471, 120 S.Ct. at 2351, 2352. (Apprendi was also sentenced to shorter concurrent sentences on the other two counts. Those sentences were not at issue on Apprendi's appeal before the Supreme Court. *See Apprendi*, 530 U.S. at 471, 474, 120 S.Ct. at 2352, 2354.)

¶114 On appeal, the Supreme Court considered whether the foregoing procedures comported with the Sixth and Fourteenth Amendments. At the outset of its analysis, the Court rejected the notion that this question could be answered by determining whether the finding that Apprendi's crime was motivated by racial bias and committed with a purpose to intimidate was an "element" of the offense or merely a sentencing "factor" or "enhancement."

> New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label "sentence enhancement" to describe the latter surely does not provide a principled basis for treating them differently.

*Apprendi*, 530 U.S. at 476, 120 S.Ct. at 2355; *see also Apprendi*, 530 U.S. at 495-96, 120 S.Ct. at 2365-66 ("[M]erely because the state legislature placed its hate crime sentence 'enhancer' 'within the sentencing provisions' of the criminal code 'does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense.' . . . [T]he mere presence of this 'enhancement' in a sentencing statute does not define its character.").[22]

¶115 The Court then examined the roles historically served by juries and judges in criminal proceedings and the measure of persuasion to which prosecutors were held. Among other things, the Court explained that in the late 18th century,

---

[22] For this reason, the State's observation that "[a] parole eligibility restriction . . . is not considered a penalty enhancement" is inapposite. "Labels do not afford an acceptable answer." *Apprendi*, 530 U.S. at 494, 120 S.Ct. at 2365 (alteration and internal quotation marks omitted).

> "[t]he substantive criminal law tended to be sanction-specific; it prescribed a particular sentence for each offense. The judge was meant simply to impose that sentence (unless he thought in the circumstances that the sentence was so inappropriate that he should invoke the pardon process to commute it)." As Blackstone, among many others, has made clear, "[t]he judgment, though pronounced or awarded by the judges, is not their determination or sentence, but the determination and sentence of the law."

*Apprendi*, 530 U.S. at 479-80, 120 S.Ct. at 2357 (second alteration in original, citations and footnotes omitted).

¶116  The 19th century saw a shift in this country from statutes providing fixed-term sentences to those providing judges with discretion; however, such discretion was invariably "bound by the range of sentencing options prescribed by the legislature." *Apprendi*, 530 U.S. at 481, 120 S.Ct. at 2358. In other words, while it had become permissible for judges to take into consideration various factors relating both to the offense and the offender in imposing judgment, such discretion could only be exercised "*within the range* prescribed by statute" for that offense. *Apprendi*, 530 U.S. at 481, 120 S.Ct. at 2358; *see also Apprendi*, 530 U.S. at 482 n.9, 120 S.Ct. at 2358 n.9 (" '[I]f the law has given the court a discretion as to the punishment, it will look in pronouncing sentence into any evidence proper to influence a judicious magistrate to make it heavier or lighter, yet not to exceed the limits fixed for what of crime is within the allegation and the verdict.' " (alteration in original) (quoting 1 J. Bishop, Criminal Law § 948 (9th ed. 1923))).

¶117  Thus, the Court observed, the historical evidence established that "punishment was, by law, tied to the offense" and that American judges "exercised sentencing

discretion within a legally prescribed range." *Apprendi*, 530 U.S. at 483 n.10, 120 S.Ct. at 2359 n.10. This evidence, in turn, pointed to "a single, consistent conclusion: The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Apprendi*, 530 U.S. at 483 n.10, 120 S.Ct. at 2359 n.10.

¶118 The Court acknowledged the inconsistency between this historically mandated conclusion and the Court's recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219 (1998). *See Apprendi*, 530 U.S. at 487-90, 120 S.Ct. at 2361-62. In *Almendarez-Torres*, the Court held that the fact of recidivism, though it may increase the maximum penalty to which a defendant is exposed, need not be charged in an indictment or information. *Almendarez-Torres*, 523 U.S. at 243-47, 118 S.Ct. at 1230-33; *see also Jones v. United States*, 526 U.S. 227, 248-49, 119 S.Ct. 1215, 1226-27 (1999) (discussing the *Almendarez-Torres* decision in detail). While this holding "represents at best an exceptional departure from the historic practice" described above, *Apprendi*, 530 U.S. at 487, 120 S.Ct. at 2361, the Court found it unnecessary to revisit the precedent for purposes of deciding Apprendi's claim, since he had not contested the decision's validity, *Apprendi*, 530 U.S. at 489-90, 120 S.Ct. at 2362. Instead, the Court distinguished *Almendarez-Torres* as "a narrow exception to the general rule." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362.

¶119 Lastly, with respect to the burden necessary to prove the facts which expose an accused to a particular punishment, the Court reaffirmed the rationales undergirding the right to have the jury verdict based on proof "beyond a reasonable doubt."

> As we made clear in *Winship*, the "reasonable doubt" requirement "has [a] vital role in our criminal procedure for cogent reasons." Prosecution subjects the criminal defendant both to "the possibility that he may lose his liberty upon conviction and . . . the certainty that he would be stigmatized by the conviction." We thus require this, among other, procedural protections in order to "provid[e] concrete substance for the presumption of innocence," and to reduce the risk of imposing such deprivations erroneously.

*Apprendi*, 530 U.S. at 484, 120 S.Ct. at 2359 (alterations and ellipsis in original, citations omitted) (quoting *Winship*, 397 U.S. at 363, 90 S.Ct. at 1072).

¶120 Hence, given the foregoing history of the jury trial right, the bounded discretion judges had in imposing sentences, and the heightened degree of persuasion required in criminal trials, the Court concluded that, except for the fact of recidivism, "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363 (alteration omitted). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362-63; *see also Apprendi*, 530 U.S. at 499, 120 S.Ct. at 2367 (Scalia, J., concurring) ("[A]ll the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury."). This inquiry "is one not of form, but of effect—does the required finding expose the defendant

69

to a greater punishment than that authorized by the jury's guilty verdict?" *Apprendi*, 530 U.S. at 494, 120 S.Ct. at 2365. For this reason, as stated earlier, the "elusive distinction between 'elements' and 'sentencing factors' " is immaterial. *Apprendi*, 530 U.S. at 494, 120 S.Ct. at 2365.[23]

¶121 In light of this constitutional rule, the Court concluded that New Jersey's statutory scheme could not stand. Pursuant to that scheme, the trial judge in Apprendi's case had been allowed to impose a punishment greater than the maximum punishment authorized for the crime of unlawfully possessing a firearm, based on the judge's finding by a preponderance of the evidence that Apprendi's purpose for unlawfully possessing a firearm was to intimidate his victim on the basis of a particular characteristic the victim possessed. *Apprendi*, 530 U.S. at 491, 120 S.Ct. at 2363. By "remov[ing] the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone," this scheme ignores "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits

---

[23] The Court clarified that the term "sentencing factor" is not "devoid of meaning." Rather, the term

> appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range authorized* by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an "element" of the offense.

*Apprendi*, 530 U.S. at 494 n.19, 120 S.Ct. at 2365 n.19.

70

of the legal penalties provided." *Apprendi*, 530 U.S. at 482-83, 120 S.Ct. at 2359. The Sixth Amendment prohibits such a practice. *Apprendi*, 530 U.S. at 491-92, 120 S.Ct. at 2363.

¶122 Applying these principles to the case at hand, the sentence range authorized by the jury's verdict—which reflected its finding, beyond a reasonable doubt, that Garrymore had "purposely or knowingly cause[d] the death of another human being," § 45-5-102(1)(a), MCA—was "life imprisonment" or "imprisonment in the state prison for a term of not less than 10 years or more than 100 years," § 45-5-102(2), MCA. (As noted above, neither the death penalty nor the exceptions listed in §§ 46-18-219 and -222 are at issue here.) The question to be answered is whether the restriction "without possibility of parole" exceeded this range. In other words, were the reasons stated by the District Court for imposing the parole eligibility restriction, in substance, factual findings that exposed Garrymore to a punishment greater than the punishment authorized by the jury's guilty verdict alone? *See Apprendi*, 530 U.S. at 482-83, 494, 120 S.Ct. at 2359, 2365.[24]

¶123 Section 46-18-202(2) provides that "[w]henever the sentencing judge imposes a sentence of imprisonment in a state prison for a term exceeding 1 year, the sentencing judge *may also* impose the restriction that the offender is ineligible for parole and

---

[24] Of course, a jury verdict is not required with respect to facts a defendant has admitted—for instance, pursuant to a guilty plea. *See United States v. Booker*, 543 U.S. 220, 232, 125 S.Ct. 738, 749 (2005) ("[T]he defendant's right to have the jury find the existence of any particular fact that the law makes essential to his punishment . . . is implicated whenever a judge seeks to impose a sentence that is not solely based on facts reflected in the jury verdict *or admitted by the defendant*." (emphasis added, citation and internal quotation marks omitted)). In the case at hand, Garrymore did not admit any of the facts on which his sentence of life imprisonment without possibility of parole is based.

71

participation in the supervised release program while serving that term" (emphasis added). By virtue of the word "may," it is clear that imposing a parole eligibility restriction is a sentencing option available to a sentencing judge to be exercised at his or her discretion whenever the sentence at issue exceeds one year. In other words, the restriction falls *within* the sentencing range prescribed by the legislature for offenses which, upon conviction, carry a sentence of imprisonment in a state prison for a term exceeding one year. This includes Garrymore's life sentence.

¶124 Indeed, in *Cavanaugh v. Crist*, 189 Mont. 274, 615 P.2d 890 (1980), on which the State relies heavily, we stated that "[§ 46-18-202(2)] does not permit district judges to add any time beyond the statutory maximum for the underlying offense." *Cavanaugh*, 189 Mont. at 278, 615 P.2d at 893. Rather, it "insures that the length of the penalty enacted by the legislature and imposed by the court is carried out." *Cavanaugh*, 189 Mont. at 278, 615 P.2d at 893. We further explained that

> [t]he restriction of parole and furlough program eligibility . . . represents one option, among others, the legislature has made available to district judges in the course of ordinary sentencing. The full restriction on parole and furlough eligibility permitted by section 46-18-202(2) has no existence apart from the sentence imposed for the underlying offense.

*Cavanaugh*, 189 Mont. at 278, 615 P.2d at 893. Thus, *Cavanaugh* makes it clear that a restriction on parole eligibility is within the range of punishments authorized by § 45-5-102(2).

¶125 However, while the foregoing language of *Cavanaugh* remains true today, it does not fully answer the question at hand, which depends on the technical meaning of

72

"statutory maximum." *See Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2362-63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed *statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)). The Court did not define this term in great detail in *Apprendi*, but it did so in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531 (2004).

¶126 In *Ring*, the Court confronted Arizona's capital sentencing scheme. Under Arizona law, the statutory maximum penalty for first-degree murder was death, *Ring*, 536 U.S. at 592, 122 S.Ct. 2434; however, "death" was not the "statutory maximum" for *Apprendi* purposes. This was so because upon a defendant's conviction of this offense, the trial judge was required to conduct a separate sentencing hearing "before the court alone" to determine "the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed." *Ring*, 536 U.S. at 592, 122 S.Ct. at 2434 (alteration and ellipsis in original, internal quotation marks omitted). Unless at least one aggravating circumstance was found *by the judge* to exist beyond a reasonable doubt, a death sentence could not legally be imposed. *Ring*, 536 U.S. at 597, 122 S.Ct. at 2437. In other words, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Ring*, 536 U.S. at 597, 122 S.Ct. at 2437.

¶127 This scheme contradicted the holding of *Apprendi*. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no

73

matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S.Ct. at 2439; *see also Ring*, 536 U.S. at 610, 122 S.Ct. at 2444 (Scalia, J., concurring) ("[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt."). It did not matter that the maximum penalty for first-degree murder under Arizona law was death. "The Arizona first-degree murder statute 'authorizes a maximum penalty of death only in a formal sense,' for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance [by the trial judge alone] before imposition of the death penalty." *Ring*, 536 U.S. at 604, 122 S.Ct. at 2440 (citation omitted).

¶128  In *Blakely*, the Court dealt with Washington's determinate sentencing scheme. Pursuant to a plea agreement, Blakely pleaded guilty to second-degree kidnapping, which as a class B felony carried a maximum term of 10 years. *Blakely*, 542 U.S. at 298-99, 124 S.Ct. at 2534-35. However, other provisions of state law mandated a "standard range" sentence of 49 to 53 months for Blakely's offense. *Blakely*, 542 U.S. at 299, 124 S.Ct. at 2535. A judge could impose a sentence above the standard range if he found "substantial and compelling reasons justifying an exceptional sentence." *Blakely*, 542 U.S. at 299, 124 S.Ct. at 2535 (internal quotation marks omitted). However, "[a] reason offered to justify an exceptional sentence [could] be considered only if it [took] into

account factors *other than* those which [were] used in computing the standard range sentence for the offense." *Blakely*, 542 U.S. at 299, 124 S.Ct. at 2535 (first alteration in original, emphasis added, internal quotation marks omitted). The trial court found that Blakely had acted with "deliberate cruelty" in committing the kidnapping and imposed an exceptional sentence of 90 months, which was 37 months beyond the statutory maximum of the standard range. *Blakely*, 542 U.S. at 300, 124 S.Ct. at 2535.

¶129 On appeal, the state argued that the 90-month sentence did not violate *Apprendi* "because the relevant 'statutory maximum' is not 53 months, but the 10-year maximum for class B felonies." *Blakely*, 542 U.S. at 303, 124 S.Ct. at 2537. The Court rejected this argument outright:

> Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04, 124 S.Ct. at 2537 (citations omitted). Thus, the Court concluded, "[t]he 'maximum sentence' is no more 10 years here than it was 20 years in *Apprendi* (because that is what the judge could have imposed upon finding a hate crime) or death in *Ring* (because that is what the judge could have imposed upon finding an aggravator)." *Blakely*, 542 U.S. at 304, 124 S.Ct. at 2538. A jury "could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a

75

determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish." *Blakely*, 542 U.S. at 306-07, 124 S.Ct. at 2539.

¶130 Thus, as *Ring* and *Blakely* make clear, the "statutory maximum" for *Apprendi* purposes is not the maximum *possible* sentence provided in the criminal code for a given offense. Rather, it is the maximum sentence the defendant may receive "on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S.Ct. at 2537 (emphasis omitted). For this reason, Garrymore's challenge cannot be answered simply by pointing out that § 45-5-102(2) authorizes a sentence of "life imprisonment" and § 46-18-202(2) permits a district judge to restrict parole eligibility. *Cavanaugh*, a pre-*Apprendi* case, did not answer the question clarified by *Ring* and *Blakely*: whether, in order to impose the "without possibility of parole" restriction pursuant to § 46-18-202(2), a district court first must find *additional* facts— i.e., facts not already admitted by the defendant or found by the jury and reflected in its verdict.

¶131 In this regard, Garrymore argues that while the maximum sentence authorized *by the statute* may be "life imprisonment" or "imprisonment in the state prison for a term of not . . . more than 100 years" *without* the possibility of parole, the maximum sentence authorized *by the jury's verdict* in his case was "life imprisonment" or "imprisonment in the state prison for a term of not . . . more than 100 years" *with* the possibility of parole. Thus, "[t]he verdict alone did not authorize the parole restriction imposed by the judge.

76

That enhancement required additional findings of fact." He acknowledges that § 45-5-102(2) does not state explicitly whether or not the punishments set forth therein include eligibility for parole; however, § 46-23-201(1) provides that "the board [of pardons and parole] may release on nonmedical parole by appropriate order any person confined in a state prison, except . . . persons serving sentences imposed under 46-18-202(2) . . . , when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community."

¶132 Accordingly, Garrymore submits, a person convicted of deliberate homicide is eligible for parole (subject to the timing requirements of § 46-23-201(2)-(3)), *unless* that eligibility is restricted after further fact-finding under § 46-18-202(2). In other words, "[a] 'life sentence' [does] not mean the offender's natural life." Rather, the terms "life imprisonment" and "imprisonment in the state prison for a term of not less than 10 years or more than 100 years" include an implicit presumption of parole eligibility which may be overcome only upon additional, post-verdict findings of fact. Therefore, he maintains, "[t]he effect of the [District Court's] post-verdict fact-finding . . . was to increase a sentence from 30 years' actual time before parole eligibility, to a literal life-time term of imprisonment."[25]

_____

[25] For purposes of the ensuing discussion, while there is no guarantee that a prisoner who is eligible for parole will in fact be paroled, the imposition of a parole eligibility restriction makes for a greater restriction on the prisoner's liberty and, thus, a harsher sentence. *See Cavanaugh*, 189 Mont. at 276, 615 P.2d at 892 ("The clear effect of section 46-18-202(2) is to permit a district judge to close one avenue for escaping the full force of a sentence."). The sentencing scheme, in fact, contemplates this characterization. *See*, *e.g.*, § 46-18-219 (mandating a life sentence without possibility of parole for specified recidivists).

¶133 Garrymore's interpretation of the interplay between §§ 45-5-102(2), 46-23-201, and 46-18-202(2) is incorrect. To be sure, a prisoner is parole eligible pursuant to § 46-23-201 unless designated otherwise pursuant to § 46-18-202(2) (or § 46-18-219, which is not at issue here). However, this scheme does not create the *Apprendi* violation Garrymore perceives. For one thing, the placement of § 46-23-201 in the Code does not support the conclusion that parole eligibility is a *presumption*, implicit in sentences imposed under § 45-5-102(2), that must be overcome through additional judicial fact-finding. Whereas § 46-18-202(2) appears in the "Sentence and Judgment" chapter of Title 46, follows a provision outlining "[s]entences that may be imposed," and itself outlines "[a]dditional restrictions on sentences," § 46-23-201, by contrast, appears in a separate chapter of Title 46 concerning the granting of probation, parole, and clemency. In the absence of explicit language to the contrary, this organization suggests that the provision on granting nonmedical parole (§ 46-23-201) yields to the provision on restricting an offender's parole eligibility (§ 46-18-202(2)), not vice versa.[26]

¶134 Furthermore, as discussed above, § 46-18-202(2) provides that "[w]henever the sentencing judge imposes a sentence of imprisonment in a state prison for a term exceeding 1 year, the sentencing judge may also impose the restriction that the offender is ineligible for parole and participation in the supervised release program while serving that term." Such an unqualified grant of authority to the sentencing judge, conditioned

---

[26] In the same vein, the State's suggestion that "life imprisonment" means "life imprisonment without possibility of parole" must be rejected. If that were the meaning intended by the Legislature, then § 46-18-202(2) would be a waste of print.

only upon the term's exceeding one year, contradicts the notion that there is a presumption of parole eligibility to be overcome. Indeed, if § 46-18-202(2) were setting forth the method for overcoming such a presumption, one would expect to see language to that effect—e.g., "if the court finds 'X' then it may restrict parole eligibility notwithstanding 46-23-201."

¶135 To be sure, the second sentence of § 46-18-202(2) mandates that "[i]f the restriction [that the offender is ineligible for parole and participation in the supervised release program while serving his term] is to be imposed, the sentencing judge shall state the reasons for it in writing."[27] Yet, while this provision, which imposes a specific requirement on a judge who restricts a defendant's parole eligibility, undoubtedly contemplates fact-finding on the part of the sentencing court in order to substantiate its

---

[27] In the case at hand, the District Judge's written reasons were as follows: "[t]he Defendant has three prior convictions of abuse and unlawful restraint"; "[t]he Defendant was arrested on the same type of charges in the States of Utah and California but moved from their jurisdiction and charges were dismissed"; "[t]he Defendant was on probation when this offense was committed"; and "[f]urther, the Court adopts a portion of Mr. Sonju's reasons." These reasons are consistent with the reasons given by the judge orally at the sentencing hearing. *See* ¶ 7 of the Court's Opinion.

The Court notes that another factor considered by the District Judge in pronouncing sentence was Garrymore's lack of remorse. *See* ¶¶ 7, 31. Specifically, the judge stated during the sentencing hearing that "throughout the trial and these proceedings, contrary to the testimony, I have not seen any remorse from this defendant." However, subsequent to Garrymore's sentencing, we decided *State v. Cesnik*, 2005 MT 257, 329 Mont. 63, 122 P.3d 456, in which we held that a sentencing court may *not* punish a defendant or augment his sentence for refusing or failing to accept responsibility or show remorse for the offense of which he has been convicted when he has a right to appeal the conviction and has invoked his right to remain silent at the sentencing hearing or expressly maintained his innocence throughout the proceedings. *Cesnik*, ¶¶ 18-25; *see also State v. Shreves*, 2002 MT 333, ¶¶ 20-23, 313 Mont. 252, ¶¶ 20-23, 60 P.3d 991, ¶¶ 20-23. In the case at hand, Garrymore does not allege that his state or federal constitutional protections against self incrimination were violated when the District Judge based the sentence in part on Garrymore's failure to demonstrate sufficient remorse; thus, for purposes of this discussion, this factor was an otherwise valid sentencing consideration.

79

imposition of the restriction, such a requirement does not necessarily place the resulting sentence beyond *Apprendi*'s "statutory maximum."

¶136   First, the Supreme Court has rejected the argument "that every fact with a bearing on sentencing must be found by a jury." *Jones v. United States*, 526 U.S. 227, 248, 119 S.Ct. 1215, 1226 (1999).  Indeed, the Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence *within a statutory range*." *United States v. Booker*, 543 U.S. 220, 233, 125 S.Ct. 738, 750 (2005) (emphasis added).  The exercise of this discretion will often, if not invariably, necessitate implicit or explicit findings of fact that the judge deems important or relevant in selecting a particular sentence.  *See Blakely*, 542 U.S. at 309, 124 S.Ct. at 2540.  However, "the defendant has no [Sixth Amendment] right to a jury determination of [these] facts." *Booker*, 543 U.S. at 233, 125 S.Ct. at 750.  As the Court explained in *Blakely*,

> the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power.  It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury.  Indeterminate sentencing does not do so.  It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty.  Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion.  But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.  In a system that says the judge may punish burglary with 10 to 40 years, every burglar knows he is risking 40 years in jail.  In a system that punishes burglary with a 10-year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10-year sentence—and by reason of the Sixth Amendment the facts bearing upon that entitlement must be found by a jury.

*Blakely*, 542 U.S. at 308-09, 124 S.Ct. at 2540.

¶137   Second, the second sentence of § 46-18-202(2) does not mandate as a condition for imposing a parole eligibility restriction that the sentencing judge find a particular fact. Rather, it requires only that the judge "state the reasons for [imposing the restriction] in writing." Section 46-18-202(2), MCA. Washington's sentencing scheme, as it existed at the time of Blakely's sentencing, is useful for illustrating this crucial distinction. That scheme did not permit the sentencing judge to enhance Blakely's sentence on the basis of the facts already used in computing the standard range sentence—i.e., on the basis of the facts admitted in Blakely's guilty plea. Rather, " '[a] reason offered to justify an exceptional sentence can be considered only if it takes into account factors *other than* those which are used in computing the standard range sentence for the offense.' " *Blakely*, 542 U.S. at 304, 124 S.Ct. at 2537 (alteration in original, emphasis added). Thus, the judge *had* to find additional facts—facts not already admitted by Blakely—in order to impose the enhanced sentence. By contrast, pursuant to the first and second sentences of § 46-18-202(2), a sentencing judge's reasons for imposing a parole eligibility restriction may take into account facts reflected in the jury's verdict, as well as other facts not reflected in that verdict; but no particular finding is mandated before the restriction may be imposed.[28]

---

[28] In *Cavanaugh*, we stated that "District Courts are required to determine whether the full restriction on parole and furlough eligibility is necessary for 'the protection of society' when a person is sentenced after conviction." *Cavanaugh*, 189 Mont. at 279, 615 P.2d at 893. In view of *Apprendi* and *Blakely*, such an interpretation of § 46-18-202(2) would render the statute unconstitutional. For this reason, this portion of *Cavanaugh*, to the extent it may be read as

¶138 Construing a sentencing scheme similar in operation to §§ 45-5-102(2) and 46-18-202(2), the Arizona Supreme Court found no *Apprendi* violation. Under the statutory provision at issue in *State v. Fell*, 115 P.3d 594 (Ariz. 2005), if the death penalty is not imposed for first-degree murder the only other possible sentences are life with the possibility of release after a specified period ("life") or life with no possibility of eventual release ("natural life"). *See Fell*, ¶ 1. Although "nothing in [the statutory provision] required that any specific fact be found before a natural life sentence could be imposed," the defendant nonetheless argued that "life is the 'presumptive' sentence for first degree murder and that natural life is an 'aggravated' sentence." *Fell*, ¶¶ 12-13. The court rejected this contention:

> The statute does not provide that a defendant "shall" receive life unless certain facts are found. To the contrary, the statute provides that "[i]f the court imposes a life sentence, the court *may* order that the defendant not be released on any basis for the remainder of the defendant's natural life." A.R.S. § 13-703(A) (emphasis added). Had the legislature intended to require a specific finding be made before a natural life sentence could be

---

making imposition of a parole eligibility restriction *contingent* on a finding by the sentencing court that it is necessary for the protection of society, is no longer good law. As explained above, the first and second sentences of § 46-18-202(2) leave imposition of a restriction on parole eligibility to the discretion of the sentencing court; they do not require such a finding.

The third sentence of § 46-18-202(2), however, is another matter. It provides that "[i]f the sentencing judge finds that the restriction is necessary for the protection of society, the judge *shall* impose the restriction as part of the sentence and the judgment must contain a statement of the reasons for the restriction" (emphasis added). In other words, if the judge "finds that the restriction is necessary for the protection of society," the judge not only *may* make the defendant ineligible for parole, the judge *must* do so (whether or not the judge would have imposed the restriction in the absence of the third sentence's mandate). Because the District Court did not impose the parole eligibility restriction on Garrymore's life sentence on the ground that it was necessary for the protection of society, we need not decide in this case whether the third sentence of § 46-18-202(2) constitutes an *Apprendi* violation.

imposed, it surely would have said so specifically, as it did in the statutes governing sentencing for felonies other than first degree murder.

> . . . In this area, the legislature has concluded that the trial court can appropriately exercise its discretion to determine whether future release is possible (although not assured) or whether the defendant must instead spend the rest of his or her life in prison.

*Fell*, ¶¶ 14-15 (alteration in original).

¶139 This reasoning is equally applicable to §§ 45-5-102(2) and 46-18-202(2). As explained above, nothing in § 46-18-202(2) *requires* a district court to make a particular finding before it restricts a defendant's parole eligibility. The Montana Legislature did not make an increase in a defendant's punishment to exclude the possibility of parole "contingent on the finding of a fact," *Booker*, 543 U.S. at 231, 125 S.Ct. at 749 (internal quotation marks omitted). Rather, § 46-18-202(2) permits the court to impose the restriction in its discretion: "the sentencing judge *may also* impose the restriction that the offender is ineligible for parole" (emphasis added).

¶140 Garrymore cites a number of cases in his briefs and his notices of supplemental authority that reach a contrary result. These decisions, however, are distinguishable from the case at hand. *State v. Provost*, 896 A.2d 55 (Vt. 2005), provides a typical example. In *Provost*, the statute at issue stated, in relevant part:

> The punishment for murder in the first degree shall be imprisonment for life and for a minimum term of 35 years *unless* the court finds that there are aggravating or mitigating factors which justify a different minimum term. If the court finds that the aggravating factors outweigh any mitigating factors, the minimum term may be longer than 35 years, up to and including life without parole. If the court finds that the mitigating factors outweigh any aggravating factors the minimum term may be set at less than 35 years but not less than 15 years.

*Provost*, ¶ 14 (emphasis added, internal quotation marks omitted).

¶141 Interpreting this provision, the Vermont Supreme Court stated that "[t]he maximum sentence the court may impose . . . without finding any facts in addition to the jury's verdict is life imprisonment with a minimum term of thirty-five years." *Provost*, ¶ 15. The court reasoned that the Vermont Legislature had intended "to attach significance to the difference between minimum terms accompanying sentences of life imprisonment." *Provost*, ¶ 17. It is not surprising, therefore, that the court ultimately concluded that the statute "violates the rule in *Apprendi* and *Blakely* because it requires the sentencing court to weigh specific aggravating and mitigating factors not found by a jury beyond a reasonable doubt *before* imposing a sentence of life without parole." *Provost*, ¶ 17 (emphasis added); *cf. State v. Leake*, 699 N.W.2d 312, 321, 323 (Minn. 2005) (also cited by Garrymore, and holding that "a judge's finding that a prior conviction constitutes a 'heinous crime' affects the 'statutory maximum' " because a sentence of life imprisonment *without* the possibility of release cannot be imposed until such a finding is made).

¶142 In light of the foregoing discussion, the punishments provided in § 45-5-102(2) do not contain a presumption of parole eligibility which must be overcome by post-verdict fact-finding before a sentencing court may impose the restriction in § 46-18-202(2) that the offender is ineligible for parole. Rather, the maximum sentence the jury's guilty verdict authorized the District Court to impose in this case was "life imprisonment" or "imprisonment in the state prison for a term of not . . . more than 100 years," *without* the

84

possibility of parole. For this reason, application of § 46-18-202(2) to Garrymore's sentence of life imprisonment was not unconstitutional under *Apprendi* and its progeny, and Garrymore's sentence, therefore, is not illegal under the Sixth and Fourteenth Amendments.

### B.    State Statutory Claim

¶143   The basis for Garrymore's state statutory claim is § 46-1-401, MCA (2001),[29] which was enacted in response to *Apprendi*. It provides, in pertinent part, as follows:

> (1) A court may not impose an incarceration penalty enhancement specified in Title 45, Title 46, or any other provision of law unless:
>
> (a) the enhancing act, omission, or fact was charged in the information, complaint, or indictment, with a reference to the statute or statutes containing the enhancing act, omission, or fact and the penalty for the enhancing act, omission, or fact; [and]
>
> (b) if the case was tried before a jury, the jury unanimously found in a separate finding that the enhancing act, omission, or fact occurred beyond a reasonable doubt; . . .
>
> . . . .
>
> (3) An enhancing act, omission, or fact is an act, omission, or fact, whether stated in the statute defining the charged offense or stated in another statute, that is not included in the statutory definition of the elements of the charged offense and that allows or requires a sentencing court to add to, as provided by statute, an incarceration period provided by statute for the charged offense or to impose the death penalty instead of a statutory incarceration period provided by statute for the charged offense.

---

[29] In his brief, Garrymore cites the 2001 version of § 46-1-401(3), but he quotes the 2003 version of this statute. The differences between these two versions have no substantive effect on Garrymore's claim; however, for the sake of accuracy, I note that the 2001 version controls, *see* ¶ 107 n.21.

85

(4) Use of the fact of one or more prior convictions for the same type of offense or for one or more other types of offenses to enhance the incarceration penalty for a charged offense is not subject to the requirements of this section.

Garrymore suggests that §§ 46-18-202(2) and 46-1-401 conflict with each other to the extent that the former authorizes a sentencing judge to restrict an offender's parole eligibility based on facts not found by a jury beyond a reasonable doubt; that § 46-1-401 prevails over § 46-18-202(2); and that the District Court, therefore, was without authority to impose the parole eligibility restriction on his sentence. (This argument is analogous to the scenario discussed above in ¶ 86 n.13.)

¶144 Garrymore is incorrect. Sections 46-18-202(2) and 46-1-401 are not in conflict. Rather, § 46-1-401 merely codifies the mandates of the Sixth and Fourteenth Amendments, as construed by the Supreme Court in *Apprendi* and its progeny. Thus, the disposition of Garrymore's claim based on this statute is identical to the disposition of his federal constitutional claim under Part III.A. above. For the reasons just discussed, the District Court's stated reasons for imposing the parole eligibility restriction on Garrymore's sentence were not facts "that allow[ed] or require[d] [the] . . . court to add to, as provided by statute, an incarceration period provided by [§ 45-5-102(2)] for [deliberate homicide]," as contemplated by § 46-1-401(3). To the contrary, the jury's guilty verdict on the charge of deliberate homicide authorized the District Court to impose a sentence of "life imprisonment" or "imprisonment in the state prison for a term of not less than 10 years or more than 100 years," *without* the possibility of parole. Thus, Garrymore's sentence does not contravene § 46-1-401.

### C.     State Constitutional Claim

¶145   Lastly, Garrymore argues that his rights under Article II, Sections 24 and 26, of the Montana Constitution were violated when the District Court deemed him ineligible for parole under § 46-18-202(2) based on facts not found by the jury beyond a reasonable doubt.  Section 24 guarantees an accused the right to "trial by an impartial jury," while Section 26 provides that "[t]he right of trial by jury is secured to all and shall remain inviolate" and that "[i]n all criminal actions, the verdict shall be unanimous."

¶146   Garrymore points out, correctly, that we have "refused to 'march lock-step' with the United States Supreme Court's interpretation of corresponding provisions in the federal constitution," particularly where, as in this case, "the language of the Montana Constitution setting forth the rights guaranteed is not identical to the language used in the federal Constitution." *Woirhaye v. Fourth Judicial Dist. Court*, 1998 MT 320, ¶ 14, 292 Mont. 185, ¶ 14, 972 P.2d 800, ¶ 14.  Thus, in *Woirhaye*, we construed Sections 24 and 26 as affording a greater jury trial right than does the Sixth Amendment, and we invalidated former § 46-17-201(3) because it allowed a misdemeanor criminal defendant to exercise his right to a jury trial only once—either in justice court or in district court on trial de novo. *See Woirhaye*, ¶¶ 6, 12-19, 25-26.

¶147   Yet, while we have interpreted some of our state constitutional provisions as providing more protection than do their federal counterparts, Garrymore has not explained, with respect to his specific sentence, why Sections 24 and 26 dictate a result

contrary to the result reached above under *Apprendi*. *Woirhaye*, which applied the jury trial right in an entirely different context, does not afford an answer.

¶148   As explained in detail above, pursuant to the first two sentences of § 46-18-202(2) a sentencing judge is authorized upon a conviction of deliberate homicide to restrict the defendant's parole eligibility without first having to find a particular fact.  This scheme satisfies the dictates of the Sixth Amendment and *Apprendi*; whether it violates Sections 24 and 26, however, is not something we can address based on the undeveloped assertion that "the increased protection afforded criminal defendants under Montana's constitutional jury trial guarantees[] establish[es] that the parole restriction imposed in this case violated Jason's rights, and is illegal."  Accordingly, Garrymore is not entitled to relief on his state constitutional claim.

## CONCLUSION

¶149  Although Garrymore did not object during the sentencing proceeding to the District Court's authority to impose the parole eligibility restriction on his life sentence, his allegation on appeal that the court lacked such authority (because § 46-18-202(2) is invalid on constitutional and statutory grounds) satisfies the requisites for invoking the *Lenihan* exception, meaning that he may obtain review of his allegedly illegal sentence, notwithstanding his failure to object.

¶150  With respect to the merits of Garrymore's arguments under *Apprendi* and § 46-1-401, MCA, the maximum sentence the jury's verdict authorized the District Court to impose in this case was "life imprisonment" or "imprisonment in the state prison for a

term of not . . . more than 100 years," *without* the possibility of parole. For this reason, the court had authority to impose the parole eligibility restriction, and Garrymore's sentence is not illegal.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter, specially concurring.

¶151 I concur in Justice Nelson's conclusion that now, rather than later, is an appropriate time to clear up the inconsistencies in our *Lenihan* jurisprudence. Therefore, I join in the discussion and proposed resolution set forth in ¶¶ 45-106 of Justice Nelson's Special Concurrence. I write separately to note that I concurred with the Court's resolution in *State v. Micklon*, 2003 MT 45, 314 Mont. 291, 65 P.3d 559, on the grounds that since it was Micklon who *initiated* the request for leniency as to the restitution requirements, he should not now be heard to quarrel with the result. I still believe this is so. However, to the extent that our decision in *Micklon* might be construed to preclude a *Lenihan* challenge under other circumstances, I would agree that the conclusion reached by Justice Nelson in ¶ 101 is legally correct.

/S/ PATRICIA COTTER